## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Case No. 0:13-cr-60267** |
| | § | |
| **ANDRE SAINT CYR** | § | |

### DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE
### UNDER 18 U.S.C. § 3582(c)(1)(A)

*"[Reverse] stings are a disreputable tactic . . . [involving] the extensive use of inducements and unrealistic temptations . . . [which] [l]aw enforcement uses . . . to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences." – Judge Richard Posner, retired Seventh Circuit Court of Appeals*

Mr. Saint Cyr has been incarcerated since October 10, 2013, for his recruited role in a "reverse stash house" sting; a Government-manufactured and fabricated scenario involving fictitious drugs, fabricated quantities, and an entirely invented robbery target. The operation produced no real drugs, no real stash house, and no actual victim; yet it resulted in severe federal charges carrying extraordinarily high sentencing exposure. These operations have since been widely condemned across the federal judiciary for their inherent unfairness, their distortion of sentencing outcomes, and their corrosive effect on the integrity of the justice system. Today, this law-enforcement tactic has been effectively abandoned, recognized as an illegitimate and discredited form of policing that should never have produced the kind of draconian sentence Mr. Saint Cyr is now serving.

Mr. Saint Cyr was neither the leader nor the most culpable participant. Yet he received the highest sentence imposed among all co-conspirators and is the only one who remains incarcerated. Mr. Saint Cyr's involvement arose from the recruitment and direction of the conspiracy's leader, Jean Cazy, after he was presented with a criminal scheme originated by an undercover agent. PSR

1

¶ 3-9. Prior to this case, Mr. Saint Cyr's entire criminal record consisted solely of two traffic infractions committed at ages 18 and 23. PSR ¶ 27-29. He had never been convicted of any violent or drug-related offenses. *Id*.

Despite the weight of his sentence and his ineligibility for First Step Act earned time credits due to his citizenship status and Hobbs Act conviction, Mr. Saint Cyr has chosen to meet his incarceration with purpose, integrity, and self-improvement. He enrolled in college courses through the University of West Georgia and serves as a peer tutor in the Bureau of Prisons' ("BOP") Education Department—helping others achieve their own academic goals. **Exhibit 2**: BOP Records at 2. He has consistently maintained employment, serving as the supervisor foreman of an orderly detail overseeing fourteen other incarcerated men, where he has never missed a day of work and has received all average or above-average evaluations. *Id*.; **Exhibit 3**: BOP Staff Character Letters, Counselor D. Stevenson at 1. In addition, he has served the institution and his peers in one of the most demanding and sensitive capacities available, as a Suicide Watch Companion with the BOP Psychology Services. **Exhibit 2**: BOP Records at 3. His disciplinary record is free of violence or drugs, and he has remained completely infraction-free for more than five years. *Id*. at 2.

Beyond his personal growth, Mr. Saint Cyr has demonstrated remarkable leadership and compassion. Most notably, he independently organized a donation drive supporting two community-based nonprofits—the Policing Alternatives and Diversion Initiative and Frontline Response—reflecting his deep commitment to restorative justice and community betterment even from within prison walls. **Exhibit 3**: BOP Staff Character Letters, K. Bailey, Reentry Affairs Coordinator at 2.

2

Mr. Saint Cyr's conduct over the past decade reflects extraordinary rehabilitation, consistent work ethic, and genuine remorse. He has transformed himself into a man defined by education and service. Upon release, he will enter ICE custody and face removal to Haiti. *See* PSR ¶ 70; **Exhibit 2**: BOP Records at 1. In Haiti, Mr. Saint Cyr will be surrounded by loved ones and provided with necessary assistance toward his rehabilitation, including, but not limiting to, employment and housing support. **Exhibit 5**: Letters of Support from Family and Community, Pastor Irick Frangel Saint Cyr at 1.

In considering 18 U.S.C. § 3582(c)(1)(A)(i)'s second-look vehicle, we must consider the statute's essential purpose to allow courts to revisit and correct sentencing outcomes that no longer serve the interest of justice and to recognize rehabilitation as an essential measure of whether continued incarceration remains warranted.

Mr. Saint-Cyr is one of the unfortunate individuals who received an enhanced sentence due to the Government intentionally construing facts in its made-up scenario to drive up fictional drug quantities and sentencing factors. And despite playing a lesser role in this fictitious offense, Mr. Saint Cyr received a sentence more severe than his more culpable co-defendant, leaving him to remain the only co-conspirator incarcerated. Mr. Saint-Cyr's 248-month sentence is further manifestly unjust given the federal judiciary's outlook on Government-manufactured scenarios, sentencing disparities between him and his co-defendants, modern sentencing practices, and his demonstrated rehabilitation. Fortunately, Congress has provided a procedural mechanism that authorizes this Court to reduce Mr. Saint Cyr's sentence where extraordinary and compelling reasons warrant such relief.

Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) and USSG § 1B1.13(b)(5) ("other reasons"), Mr. Saint-Cyr moves this Court to reduce his sentence to time served.

## I.        Personal background

Mr. Saint Cyr's life has been marked by extraordinary hardship from its very beginning. He was born in Haiti and suffered a devastating loss at the age of three when his mother, who was only 22 years old, was killed in a car accident.[1] He was her only child. Her death left him in the care of his maternal grandmother, a woman who shouldered an almost unimaginable burden. She had six daughters, five of whom died young, leaving behind children she then raised together under one roof. In a two-bedroom home crowded with eleven children, the family suffered severe poverty.

Despite these challenges, Mr. Saint Cyr's grandmother did everything she could to guide him, instilling in him a sense of responsibility and the importance of hard work. From an early age, he worked on farms in Haiti to help support the household, developing the work ethic that would define him for the rest of his life.

When he was 14, he immigrated to the United States with his father, hoping for stability and opportunity. Instead, he soon discovered that his father had no intention of raising him. He was left to navigate a new country almost entirely on his own and began moving between the homes of relatives and family friends while trying to attend school and survive in an unfamiliar environment.

Despite this profound instability, Mr. Saint Cyr consistently worked throughout high school and continued working without interruption from age 16 until his arrest in this case. In fact, at the time of his arrest on October 10, 2013, he had been working as a selector at Sysco Food Services, where he maintained continuous employment for six years from November 2007 through October 2013. PSR ¶ 52. In addition, in the months leading up to his arrest, he took on a second full-time

---

[1] The PSR notes that Mr. Saint Cyr's mother died in 2010. This is inaccurate. She died when Mr. Saint Cyr was three years old in the late 1980s.

job at Willoughby Supply, where he had been employed for approximately five months. PSR ¶ 53. He was working two jobs simultaneously in an effort to support his growing family and assist his ailing paternal grandmother. He has never gone a year of his adult life without steady employment.

During the period of the instant case, Mr. Saint Cyr was under immense personal and financial strain. His girlfriend was pregnant with his third child, his grandmother's health was rapidly declining, and he was struggling to meet basic financial obligations despite working relentlessly. Tragically, on the very day of his arrest, Mr. Saint Cyr's girlfriend suffered a miscarriage. Less than a month before he was sentenced, in May 2014, his paternal grandmother passed away.

Since that time, Mr. Saint Cyr has lost nearly everyone who ever provided him care and guidance. Today, his grandfather, who resides in Haiti and is in declining health, is the only close family member remaining. Mr. Saint Cyr has now spent more than twelve years incarcerated, separated from his children during the most formative years of their lives. He has missed their childhoods, milestones, and the daily presence that only a father can provide—losses that cannot be reclaimed and that weigh heavily on him.

Mr. Saint Cyr's early years were defined by profound loss, poverty, and a lack of guidance. Yet he persisted, worked hard, and did everything he could to build a life for himself and his family. Mr. Saint Cyr does not minimize his conduct in this case. He is deeply remorseful for his decisions and for the far-reaching impact they have had on his children and family. His personal background does not excuse his conduct, but it provides essential context for understanding the pressures, losses, and vulnerabilities that shaped his circumstances at the time he was approached by Cazy with this fictitious scheme orchestrated by the UC, and underscores the extraordinary transformation he has undergone since.

## II.      Offense conduct

In April 2013, a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") Special Agent working in an undercover capacity ("UC") approached and met with Cazy and a confidential informant at a local restaurant in Fort Lauderdale. PSR ¶ 4. It was the UC who, according to the Government's account, initiated the criminal scheme by representing that he was a disgruntled narcotics courier seeking to arrange a robbery on a Colombian Drug Trafficking Organization ("DTO") for whom the UC claimed to work for. *Id*. Cazy expressed his interest in conducting the robbery. *Id*. The UC informed Cazy that he would provide the stash house address on the day of the scheduled pick-up and that, in exchange for his involvement in the robbery, he expected to receive  five kilograms of cocaine taken from the stash house. *Id*. From the start, this plan was entirely fictitious: the UC's story, the DTO, and the stash house were all creations of law enforcement. There were no actual drugs, no real stash house, and no intended victim.

During that initial meeting, Cazy—not Mr. Saint Cyr—expressed interest in carrying out the UC's proposed robbery and stated that he had people who could assist. *Id*. Cazy represented himself as someone who was routinely sought out to carry out robberies—known as the "best", supplied specific tactical details about how such a robbery could be organized (including restraining guards and the UC, and using zip ties), and asserted he should buy the UC's share of the cocaine due to his ability to quickly sell quantities of cocaine. *Id*.

Cazy thereafter assembled a group of individuals, including Mr. Saint Cyr, to assist in what they believed was a robbery. Importantly, Mr. Saint Cyr did not originate this plan; he was recruited into a law enforcement-created, fictitious scenario that had already been fully conceptualized and initiated by the UC and Cazy. By the time Mr. Saint Cyr became involved, the basic details of the operation had already been set.

In September 2013, a meeting occurred that included the UC, Cazy, Mr. Saint Cyr, and Baptiste. PSR ¶ 5. As the Government states, these were the individuals "Cazy wanted to help commit the cocaine stash house robbery." *Id*. At that meeting the UC again framed the enterprise—reiterating that he sought someone to rob the Colombian DTO's stash house of at least 15 kilograms of cocaine—and confirmed the details agreed upon between him and Cazy. *Id*. At the meeting, Mr. Saint Cyr described some of the operational details: dressing as police officers, cutting electricity, and taking the cell phones of persons inside the stash house; he also advised the UC to use an untraceable "throw away" phone. *Id*. at ¶ 6. A later agreement was made to where the UC would receive 25% of the kilograms stolen. *Id*. While Mr. Saint Cyr contributed ideas about how to carry out the UC's fictional plan, the overall concept, target, and supposed cocaine were entirely products of the UC's imagination and direction, with the contribution of Cazy before Mr. Saint Cyr even became involved. At no time did Mr. Saint Cyr initiate contact, propose a robbery, or target real victims.

In October 2013, Mr. Saint Cyr, Cazy and four others assembled and waited for the UC to provide the stash house address. *Id*. at ¶ 8. Unknown to them, the "stash house" and "DTO" did not exist—it was all part of a Government reverse stash house sting. The men were taken into custody at an undercover facility before any robbery could occur. No robbery ever took place, no one was harmed, and no property or narcotics were stolen—because there were no real drugs, guards, or victims in the first place.

### III.   Congress Intended 18 U.S.C. § 3582(c) and USSG § 1B1.13(b)(5) to provide a safety valve for extraordinary and compelling cases like Mr. Saint Cyr's.

Congress enacted 18 U.S.C. § 3582(c) to "provide[] 'safety valves' for modification of sentences'" in appropriate cases. *See* Comprehensive Crime Control Act codified at S. Rep. No.

98-225, at 121 (1983). As Congress explained, "[t]he first 'safety valve' applies, regardless of the length of sentence, to the unusual case in which the defendant's circumstances are so changed [] that it would be inequitable to continue the confinement of the prisoner." *Id*. Congress noted "[t]he value of the forms of 'safety valves' contained in [Section 3582] lies in the fact that they assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons[.]'" *Id*. Most importantly, Section 3582(c) "keeps the sentencing power in the judiciary where it belongs, yet permits later review of sentences in particularly compelling situations." *Id*.

Pursuant to 18 U.S.C. § 3582(c)(1)(A) and USSG § 1B1.13, this Court should exercise its discretion and reduce Mr. Saint Cyr's sentence.[2] The Sentencing Commission's policy statement, USSG § 1B1.13, is binding authority for courts considering motions under 18 U.S.C. § 3582(c)(1)(A). *United States v. Bryant*, 996 F.3d 1243, 1251–52 (11th Cir. 2021). "Although the statute charges courts with making the discretionary call about whether a sentence should ultimately be reduced, the Commission is tasked with defining the universe of 'extraordinary and compelling circumstances.'" *Id*. at 1255.

### IV. The totality of Mr. Saint Cyr's circumstances—including the true nature of the underlying offense, sentencing disparities and exceptional rehabilitation—constitute extraordinary and compelling reasons for relief under § 1B1.13(b)(5).

Mr. Saint Cyr's case presents a unique circumstance that merits a reduction in his sentence under USSG § 1B1.13(b)(5) ("other reasons"). The Commission retained the 'other reasons' category "recogniz[ing] that [it] could not possibly identify the myriad extraordinary and

---

[2] Mr. Saint Cyr has satisfied the exhaustion requirement: undersigned counsel sent a request to the Warden on Mr. Saint Cyr's behalf on November 18, 2025, seeking a reduction in sentence pursuant to USSG § 1B1.13(b)(5). **Exhibit 1**: Letter to Warden. Having waited more than thirty days without a response, Mr. Saint Cyr's motion is properly before this Court.

compelling reasons that might warrant a sentence reduction." *United States v. Smith*, 762 F. Supp. 3d 1249, 1253 (S.D. Fla. 2024) (citation and quotation marks omitted). Importantly, "[t]he Commission considered but specifically rejected a requirement that 'other reasons' be similar in *nature and consequence* to the specified reasons." *United States v. Cromitie*, 2024 WL 216540, at *5 (S.D.N.Y. Jan. 19, 2024). Instead, the reasons "need be similar *only in gravity*, a requirement that inheres in the statutory requirement that they present extraordinary and compelling reasons for a sentence reduction." *Id*. As the Commission explained:

> Guidance beyond that provided in the amended policy statement regarding what circumstances or combination of circumstances are sufficiently extraordinary and compelling to warrant a reduction in sentence is best provided by reviewing courts, rather than through an effort by the Commission to predict and specify in advance all of the grounds on which relief may be appropriate.[3]

One district court observed the "catchall maintains the broad discretion conferred on district courts to consider a wide array of extraordinary and compelling justifications for release." *United States v. Smith*, 2024 WL 733221, at *2 (D. Md. Feb. 21, 2024). The court explained, "[w]hen describing the reasoning behind the provision, the Commission stated it determined that, by retaining a broad catchall provision that allows for consideration of reasons similar in gravity to those enumerated in the policy statement, courts would have both *discretion* and guidance necessary to grant reductions in *any* appropriate case.'" *Id*. (quoting *U.S. Sent. Comm'n, 2023 Amendments in Brief* [4]). *See United States v. Anderson*, 2025 WL 3010302, at *3 (S.D. Fla. Oct. 17, 2025) (explaining that "the United States Sentencing Commission intended for judges to

---

[3] United States Sent. Comm'n, *Amendment 814*, Revisions to "Extraordinary and Compelling Reasons," *available at*:
https://www.ussc.gov/guidelines/amendment/814.

[4] *Available at*: https://www.ussc.gov/sites/default/files/pdf/amendment-process/amendments-in-brief/AIB_814.pdf.

exercise discretion on a case-by-case basis to determine whether this 'catch-all' provision should apply to a particular sentence").

The following cases illustrate the growing variety of sentence reductions pursuant to the USSG § 1B1.13(b)(5) ("catch all") provision:

- *Anderson*, 2025 WL 723237, at *6 (resentencing defendant due to outstanding record of rehabilitation, service to others, and youth at time of offense)
- *United States v. Brown*, 715 F. Supp. 3d 1034, 1044-56 (S.D. Ohio 2024) (applying § 1B1.13(b)(5) to reduce defendant's excessive sentence that was the "product of the Government's pressure campaign" to commit the crime, and overly long "when compared to the time that [defendant's] co-defendants served in prison")
- *United States v. Willingham*, No. 15-60079-Cr, 2025 WL 2424307, at *2–3 (S.D. Fla. Aug. 21, 2025) (reducing a defendant's sentence under section 1B1.13(b)(5) based on his young age at the time of sentencing, traumatic childhood, lack of criminal history, and demonstrated rehabilitative efforts)
- *United States v. Cannon*, 2025 WL 326065 (M.D. Ga. Jan. 29, 2025) (granting relief based largely on disparities related to codefendants)
- *United States v. Brown*, 2023 WL 8653179, at *3 (D. Md. Dec. 14, 2023) (granting sentence reduction because defendant's 22-year sentence for a "nonviolent drug offense remains too long, especially in light of changes in the law and in sentencing practices")
- *United States v. Holton*, 2024 WL 4893643 (D. Md. Nov. 25, 2024) (finding "the disparity in Holton's sentence in comparison with other defendants nationally constitutes an extraordinary and compelling reason justifying a reduction in his sentence, especially considering Holton's admirable rehabilitative efforts since his incarceration)
- *United States v. Eder*, 2024 WL 2749395 (D. Mont. May 29, 2024) (granting relief based on data showing a disparity between the individual's sentence and other sentences for second-degree murder)
- *United States v. Smith*, 2024 WL 733221, at *2 (D. Md. Feb. 21, 2024) (granting sentence reduction because "Mr. Smith's sentence length is extraordinarily excessive and disproportionate" and considering "the totality of Mr. Smith's submissions and circumstances").

This case arose entirely from a Government-manufactured scenario—a so called "reverse stash house sting." The UC conceived the plan, chose the "target", and orchestrated the fictional opportunity from start to finish. The supposed stash house, the Colombian DTO, and the kilograms of cocaine all existed only in the UC's imagination. Cazy, not Mr. Saint Cyr, was the first to express interest in the UC's proposal. Cazy went on to take the lead in recruiting others, providing tactical details, and boasting his experience in robberies and drug trafficking. Mr. Saint Cyr was recruited

into this plan after it had already been devised and directed by both the UC and Cazy. While Mr. Saint Cyr participated in the planned "robbery" and made operational contributions, the Government's factual record attributes the origin of the criminal objective and the initial recruitment to the UC, and the central organizing and leadership functions to Cazy. Mr. Saint Cyr was not shown to be the source of the idea, the principal organizer of the broader scheme, or the person who participated in the initial contact with the UC.

In evaluating this case for a sentence reduction, it is significant that this Court consider there was no involvement of actual drugs, victims, or violence, and that Mr. Saint Cyr's participation stemmed from a Government-initiated operation where he was recruited by Cazy, the Government's initial target. The offense conduct, while serious in theory, did not result in tangible harm. In light of the absence of any real victims, Mr. Saint Cyr's subordinate role, unjust sentencing disparities, and his subsequent rehabilitation, continued incarceration no longer serves the interest of justice or public safety.

i.   *Mr. Saint Cyr's rare and unique convictions arise from a discredited law-enforcement tactic that courts have widely rejected.*

Mr. Saint Cyr's conviction arises from a type of law enforcement operation that has since become virtually extinct: the so-called "reverse stash house sting." These manufactured conspiracies, engineered entirely by Government agents and informants were once a controversial tool of the ATF but have been widely condemned by courts, scholars, and the public for producing arbitrary and excessive sentences untethered to any actual criminal conduct. *See United States v. Rivero*, 762 F.Supp.3d 1245 (S.D. Fla. 2024) (granting relief primarily under § 1B1.13(b)(5), albeit with a nod to (b)(6), based on problems with the fake stash house sting prosecution); *see also United States v. King*, 2024 WL 4274793 (N.D. Ill. Sept. 20, 2024) (granting relief under § 1B1.13(b)(5) based on fake stash house sting operation although the government has abandoned

these "tawdry" operations, combined with co-defendant disparity and rehabilitation); *see also United States v. Conley*, 2021 WL 825669, *4 (N.D. Ill. Mar. 4, 2021) (finding a sentence reduction was proper under § 1B1.13(b)(5), as "Conley was the next to least culpable, yet received the longest prison sentence by double based on outrageous and disreputable law enforcement tactics, followed by the prosecution's relentless pursuit of the sentence despite the rebuke of these cases across the country."); *see also United States v. White*, No. 09-CR-687-4, 2021 WL 3418854 (N.D. Ill. Aug. 5, 2021) (holding that even before § 1B1.13(b)(5), stash house stings could produce extraordinary circumstances).

The unique nature of Mr. Saint Cyr's prosecution places his case among a small set of prosecutions that courts now recognize as deeply problematic. Courts and commentators have increasingly recognized that these prosecutions raise serious concerns of fairness, proportionality, and justice, and that continued incarceration under such circumstances may constitute an "extraordinary and compelling reason" for relief under USSG § 1B1.13(b)(5).

The case of *United States v. Sherlon Evans*, 759 F.Supp.3d 1247 (S.D. Fla 2024), Case No. 93-00123-CR-Middlebrooks, from the Southern District of Florida, illustrates this very principle. In *Evans*, the court granted a reduction in sentence based on facts nearly identical to those present here, finding that the nature of the conviction itself—arising entirely from an ATF-manufactured sting—warranted a reduction in sentence under USSG § 1B1.13(b)(5). **Exhibit 4**: Evans Order.

Evans was tried and convicted of (1) conspiracy to possess with intent to distribute cocaine, (2) use of firearms during and in relation to a drug-trafficking crime, (3) possession of unregistered firearms, and (4) intimidating a witness. *Id*. at 6. These convictions arose from a so-called "reverse stash house sting" orchestrated by agents of ATF.

In *Evans*, an ATF agent, through a confidential informant, initiated contact with a target and fabricated a story about an incoming shipment of drugs. *Id*. at 5. Evans was not present during this initial meeting. The agent then asked whether the target would be interested in "ripping off" the shipment. *Id*. The target then went on to assemble a group—including Mr. Evans's—to carry out the fictitious robbery. *Id*. The agent conducted several follow-up meetings, during which the supposed participants were induced to discuss the logistics of the robbery, including the quantity of drugs involved. *Id*. When the group arrived to executed the fake robbery, they were arrested. *Id*. at 5, 6. No drugs ever existed, the entire "conspiracy" was conceived, orchestrated, and controlled by the ATF agent. *Id*.

The *Evans* court recognized that these reverse-sting cases follow a "standard playbook," noting:

> "For the past thirty years, the ATF has employed reverse stings to arrest and prosecute would-be drug dealers. The 'standard playbook' of a reverse stash-house sting is simple, and the facts between cases are frequently nearly identical."

*Id*. at 3.

The court observed that through such operations, "those ensnared agree to arrive at the shipment location, armed and prepared to steal drugs," and are then arrested and charged with conspiracy to possess large, fictitious quantities of narcotics driven upward by the acting agent, and often coupled with weapons charges that exponentially increase sentencing exposure. *Id*.

In granting Mr. Evans's motion, Judge Middlebrooks also recognized the troubling context surrounding these stings, citing that "[f]rom the early 2000s to the mid-2010s, the ATF 'more than quadrupled the use of these controversial sting operations as part of a crime-fighting strategy meant to target armed and violent criminals,'" and that a *2014 USA Today* investigation found "over 90% of those targeted in these ATF operations were racial or ethnic minorities." *Id*. at 3, 4. Moreover,

in *United States v. Black*, the Ninth Circuit expressed "major concern" that the ATF frequently found new suspects by "trolling for targets," with officers and informants "provocatively cast[ing] [their] bait in places defined only by economic and social conditions." 733 F.3d 294, 303 (9th Cir. 2013); *id*. at 4.

These findings, and the testimony of legal scholars such as Professor Erica Zankel of the University of Chicago before the U.S. Sentencing Commission on February 23, 2023, underscored why the Commission adopted § 1B1.13(b)(5). *Id*. at 24. Zunkel expressly cited to reverse stash house stings, which she contended "illustrated the need for a catch-all category[.]" *Id*. Applying this catch-all provision, the *Evans* court held: "the circumstances surrounding Mr. Evans's conviction are of sufficient gravity under § 1B1.13(b)(5), as taken together, they compel the conclusion that his continued incarceration would be manifestly unjust." *Id*. at 26.

The court emphasized that while these considerations were not statutorily relevant at the time of sentencing, they were proper grounds for relief under § 1B1.13(b)(5). *Id*. at 26. The court further clarified that this provision is not "a vehicle to question the wisdom of the Government's policing or prosecutorial practices," but rather "a vehicle [] to question the wisdom of continuing to incarcerate this *particular* man." *Id*. at 30.

The same reasoning applies here. Like Mr. Evans's, Mr. Saint Cyr was prosecuted for being recruited into a conspiracy that was wholly manufactured by Government agents, with no real drugs, no actual victim, and no robbery that ever occurred. Yet, he was subject to an extraordinarily harsh sentence, one that does not reflect the true nature of the conduct or the contemporary understanding of the flaws in reverse stash house prosecutions.

Moreover, as the *Evans* court noted, such operations have now become "vanishingly rare" and have been "decried by numerous courts across the country." *Id*. at 4, 5, 27, 28. The evolving

consensus that these prosecutions are fundamentally unfair underscores the unjustness of continuing to incarcerate Mr. Saint Cyr under a sentence born of that discredited practice. For example, at least forty-three people convicted in reverse stash house stings have ultimately received sentence reductions—typically to about three years—after protracted litigation exposed serious concerns about the ATF's racially discriminatory use of these operations, including stings of the very kind in which Mr. Saint Cyr was ensnared. *Id*. at 28, fn 12.

Like Mr. Evans, Mr. Saint Cyr has now served approximately 60% of his sentence. *Id*. at 1. Under § 1B1.13(b)(5), and consistent with the reasoning in *Evans*, the Court should find that continued incarceration would serve no just purpose and grant a sentence reduction.

ii. *The significant disparity between Mr. Saint Cyr's sentence and those of his co-conspirators—as well as individuals across the nation—constitutes an extraordinary and compelling reason for relief.*

Despite Mr. Saint Cyr's lesser role, he received the most severe sentence of all participants—a punishment far greater than that imposed on Cazy, who played a more significant and leadership role. Every other co-conspirator has since completed their sentence and been released: Jean Robert Jean-Baptiste, Jr., Jean Georges, Alex Richemond and Adlert Richemond all received imprisonment sentences of 60 months and five years of supervised release. PSR at 3. Mr. Saint Cyr is now the only individual still incarcerated as a result of this fictitious criminal scheme. Absent a sentence reduction, Mr. Saint Cyr will remain incarcerated until 2031.

| Defendant | Sentence | Release Date[5] |
|---|---|---|
| Andre Saint Cyr | 295 months; reduced to 248 months | July 2, 2031 |
| Jean Cazy | 248 months; reduced to 211 months | July 16, 2025 |
| Jean Robert Jean-Baptiste, Jr. | 60 months; reduced to 48 months | April 4, 2017 |
| Jean Georges | 60 months | April 18, 2018 |
| Alex Richemond | 60 months | February 16, 2018 |
| Adlert Richemond | 60 months | February 16, 2018 |

---

[5] *See* https://www.bop.gov/inmateloc/

Cazy, who received a lesser sentence than Mr. Saint Cyr, played the primary role in organizing participants and setting up logistics. Cazy recruited Mr. Saint Cyr into the plan after it had already been conceived and structured. Mr. Saint Cyr's involvement was limited to participating in discussions and preparing for what he believed was a robbery, according to Cazy. One that, in fact, never existed. This disparity on its own is unjustified and warrants a reduction in sentence for Mr. Saint Cyr. *See United States v. Jones*, No. PJM-94-0441, 2022 WL 3139810, 4 (D. Md. Aug. 4, 2022) (finding disparity between defendant's and his co-defendant's sentences was an extraordinary and compelling reason for release); *see also Brown*, 715 F.Supp.3d at 1044-1046 (concluding that a sentence reduction to time served was warranted under (b)(5) because of the "draconian and oppressive length of Mr. Brown's sentence in absolute terms," the "shocking disparity" with the sentences served by his co-defendants, Mr. Brown's rehabilitation, his strong family support, and his release plan); *see also United States v. Eccleston*, 573 F.Supp.3d 1-13, 1017 (D. Md. 2021) (agreeing a disparity between the sentences of co-defendants can constitute "an extraordinary and compelling circumstance that justifies a sentence reduction."); *see also United States v. Sappelton*, PJM-01-284, 2021 WL 598232, at *1, *3 (D. Md. Feb. 16, 2021) (finding extraordinary and compelling circumstances based on sentencing disparity even when the conspiracy leader cooperated and pled guilty); *see also United States v. Brown*, 2025 WL 2429021, at *3 (S.D. Fla. Apr. 25, 2025) (granting under 1B1.13(b)(6) in a stacked 924(c) case, and also granting under (b)(5) based primarily on (1) defendant's young age and mental instability at the time he committed his crimes, (2) the disparity between defendant's sentence and the sentences of his codefendants as well as those sentenced for similar crimes after the First Step Act's alterations to § 924(c), and (3) defendant's rehabilitative efforts").

This disparity is even more striking given Mr. Saint Cyr's background in comparison to Cazy's. Mr. Saint Cyr has zero criminal history points and is in criminal history category I. PSR ¶ 29. His only prior convictions were two traffic violations from his youth, neither of which involved drugs, violence, or any criminal intent. PSR ¶ 27-29. In stark contrast, Cazy—the actual instigator and self-professed leader of the conspiracy—was facing charges at the time of this case for raping and impregnating a minor. [6] Cazy ultimately pled guilty in 2017 to lesser charges of Battery of a Child and was sentenced to almost one and a half years in jail. **Exhibit 6**: Cazy Court Records. Yet nonetheless received a more lenient sentence than Mr. Saint Cyr and has since been released.



**Leader in 2013 cocaine theft charged in rape, impregnation of teen**

Olivia Hitchcock ohitchcock@pbpost.com
Nov. 6, 2016 · Updated Nov. 7, 2016, 5:35 p.m. ET

Jean Cazy is charged with lewd behavior with a minor. (Provided by the Palm Beach County Sheriff's Office) Palm Beach Post



JEAN CAZY

Register Number: 04175-104

Age:    44
Race:   Black
Sex:    Male

Not in BOP Custody as of: 07/16/2025

In 2017, Mr. Saint Cyr was afforded a sentence reduction that only provided him with the imprisonment sentence provided at Cazy's initial sentencing—for which Cazy did not serve to its entirety and is evident by his release.[7] Whereas Mr. Saint Cyr's release date is 2031. The record therefore reflects a sentencing disparity that fails to account for Mr. Saint Cyr's lesser culpability

---

[6] The Palm Beach Post, *Leader in 2013 cocaine theft charged in rape, impregnation of teen*, *available at*: https://www.palmbeachpost.com/story/news/crime/2016/11/07/leader-in-2013-cocaine-theft/6947654007/.

[7] At his initial sentencing, Mr. Saint was sentenced to 295 months imprisonment. ECF 233. In 2017, he received a sentence reduction of 248 months. However, at Cazy's initial sentencing, he received a sentence of 248 months' imprisonment. PSR ¶ 3.

in the underlying fictitious offense, absence of criminal history points, and highlights the injustice of his continued incarceration.

Taking things a step further, outside of his co-conspirators, Mr. Saint-Cyr's sentence is also disproportionate nationally. The United States Sentencing Commission has comprised a dataset for sentences imposed in cocaine drug trafficking cases for 2024. For defendants in criminal history category I in the Southern District of Florida, the average imprisonment sentence imposed was 73 months.[8]



**Average and Median Sentence Length**
Fiscal Year 2024

The figure includes the 143 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2024; Circuit: 11th Circuit; State: Florida; District: Florida, Southern; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Drug Trafficking; Guideline: §2D1.1; Drug Type: Powder Cocaine; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

Turning to robbery cases in 2024, the average sentence during this timeframe for defendants in criminal history category I in the Southern District of Florida was 87 months.[9] It is

---

[8] U.S. Sent'g Comm'n, Interactive Data Analyzer, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard (last accessed January 23, 2026).

[9] *Id.*

worth noting that this number likely includes actual robberies involving real drugs and victims, for which Mr. Saint Cyr was not convicted of.




**Average and Median Sentence Length**
Fiscal Year 2024



The figure includes the 24 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1.
**FILTER:**
Fiscal Year: 2024; Circuit: 11th Circuit; State: Florida; District: Florida, Southern; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Robbery; Guideline: §2B3.1; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All

Given this landscape, it is difficult to justify the 248-month sentence Mr. Saint Cyr is serving today. That is so even if the sentence was justified at its time and in its context.

"Punishments that did not seem [] unusual at one time may, in light of reason and experience, be found [] unusual at a later time[.]" *Graham v. Florida*, 560 U.S. 48, 85 (2010) (Stevens, J., concurring). Therefore, "proportionality review must never become effectively obsolete[.]" *Id.* All in all, "[c]ompassionate release matter[s] ... It matters even when no crisis looms, but simply when continued incarceration would be 'greater than necessary' to achieve the ends of justice." *United States v. Copeland*, 2020 WL 2537250, at *2 (E.D.N.Y. May 19, 2020).

This is such a case. As held by the Second Circuit, a district court does not "abuse its discretion by granting someone compassionate release" on the basis "that his sentence was too long in the first place," alone. *United States v. Booker*, 976 F.3d 228, 237 (2nd Cir. 2020). Rather, the only statutory limit on what a court may consider to be extraordinary and compelling is that

"[r]ehabilitation ... alone shall not be considered an extraordinary and compelling reason." *Id*. at 238 (citing 28 U.S.C. § 994(t)).

iii.     *Mr. Saint Cyr's exemplary rehabilitation and record of service demonstrates his extraordinary transformation and readiness for reentry.*

Remarkably, BOP staff have formally recognized Mr. Saint Cyr's transformation. K. Bailey, BOP Reentry Affairs Coordinator, reported that "Mr. Saint Cyr has demonstrated remarkable personal growth, dedication, and a commitment to giving back to the community, qualities that make him an exceptional candidate for reintegration into society." *See* **Exhibit 3**: BOP Staff Character Letters, K. Bailey, Reentry Affairs Coordinator at 2.



UNITED STATES GOVERNMENT
**Memorandum**
FEDERAL BUREAU OF PRISONS
United States Penitentiary Atlanta
Atlanta, Georgia 30315

October 22, 2025

I am writing to briefly speak on Andre Saint Cyr's character, who is nearing the end of their sentence and is preparing for release. During his time here, Mr. Saint Cyr has demonstrated remarkable personal growth, dedication, and a commitment to giving back to the community, qualities that make him an exceptional candidate for reintegration into society.

One of the most notable achievements during Mr. Saint Cyr's incarceration has been his initiative in coordinating a donation drive for two non-profit organizations: Policing Alternatives and Diversion Initiative and Frontline Response. This initiative not only highlights his ability to organize and lead but also reflects a deep understanding of the needs within the community. Through his efforts, Mr. Saint Cyr successfully contributed to raising funds that were directly utilized to support at-risk individuals.

Mr. Saint Cyr exhibited strong leadership skills, empathy, and an unwavering commitment to making a positive impact, demonstrating his readiness to contribute meaningfully once released. His positive attitude and willingness to help others has made a significant impact not only on fellow inmates but also on the larger community within our facility.

As the Reentry Affairs Coordinator, I firmly believe that Mr. Saint Cyr is prepared for a successful transition back into society and will continue to make constructive contributions. He has shown a commitment to personal growth and an understanding of how to positively impact the world around him.

Best regards,

K. Bailey, Reentry Affairs Coordinator

*Id*.

Both prison staff and fellow incarcerated individuals described Mr. Saint Cyr as a respected leader and role model, someone who not only pursues his own rehabilitation, but actively supports the growth of those around him as well. *Id.*; *see also* **Exhibit 2**: BOP Records at 2. It is exceptionally rare for BOP staff to write letters on behalf of an incarcerated person, yet some have done so in Mr. Saint Cyr's case – an extraordinary endorsement that speaks to his character, reflects his positive influence within the institution, and his consistent commitment to bettering himself and those around him. **Exhibit 3**: BOP Staff Character Letters.

Although Mr. Saint Cyr's citizenship status and nature of the Hobbs Act offense prevents him from earning First Step Act earned time credit, he has still taken deliberate and meaningful steps toward rehabilitation. **Exhibit 2:** BOP Records at 8-9, and 13. His conduct in prison has been outstanding and supports a reduction in sentence. USSG § 1B1.13(d) (stating that rehabilitation by itself is not an extraordinary and compelling reason for release but that it "may be considered in combination with other circumstances" to determine whether a sentence reduction is warranted). Further, courts in the Eleventh Circuit have found rehabilitation to be extraordinary and compelling when considered with other factors.[10] Mr. Saint-Cyr's marked rehabilitation while in prison has indeed been extraordinary and his hard work has prepared him for a productive life after release.

Mr. Saint Cyr has taken full advantage of the many BOP educational and vocational programming courses. He has engaged in hundreds of hours of education classes all with the understanding that he would be ineligible to receive time off his sentence and no chance of early

---

[10] *See United States v. Daley*, 484 F. Supp. 3d 1171, 1175-77 (M.D. Fla. 2020) ("[P]articipat[ion] in numerous educational classes . . . is a factor that can be considered as a part of the overall circumstances" and "when all of th[e] circumstances are viewed together, they justify Defendant's release."); *United States v. Welch*, No. 09-60212-CR, 2020 WL 4333667, at *2 (S.D. Fla. May 21, 2020) (granting release where the defendant had "completed numerous educational programs while in prison, including obtaining his GED and taking college level courses"); *United States v. Hope*, No. 90-CR-06108-KMW-2, 2020 WL 2477523, at *4 (S.D. Fla. Apr. 10, 2020) (granting release where the defendant had "demonstrated an impressive record of rehabilitation . . . [and] that he is dedicated to making significant changes in his life").

release under First Step Act earned time credits. *Id.* at **Exhibit 2:** BOP Records at 8-9, 11, and 13. Mr. Saint Cyr's progress report shows that he has not merely enrolled in classes, but has pursued a broad and meaningful range of programming, including, but not limited to, Commercial Driver's License preparation, Spanish, IRS Tax, Money Management, Culinary Math, Masonry, Anger Management, Financial Peace, Job Fair and Placement, Drug Education, and Alternatives to Violence. *Id.* at 11. Collectively, these courses reflect a deliberate effort to build practical skills, strengthen emotional resilience, and prepare himself for stable, productive reentry into society. In addition to these programs, Mr. Saint Cyr has gone above and beyond by enrolling in and successfully participating in college-level coursework through the University of West Georgia, further demonstrating his commitment to personal growth and rehabilitation. *Id.* at 2.

All the while, Mr. Saint Cyr has also maintained steady and meaningful employment during his incarceration. **Exhibit 2**: BOP Records at 2. Currently, he is employed as the supervisor foreman of an orderly detail, where he oversees 14 incarcerated individuals in their daily duties. **Exhibit 3**: BOP Staff Character Letters, Counselor D. Stevenson at 1.



**U. S. Department of Justice**
*FCI Atlanta*
*601 McDonough Blvd, S.E.*
*Atlanta, Georgia 30315*

Date:        October 21, 2025

To:           Whom It May Concern

From:        D. Stevenson, Counselor

Subject:     **Saint Cyr, Andre**
             **Reg.:   04179-104**

If you want to add to Saint Cyr letter you can put from me. I Counselor Stevenson, have had inmate Saint Cyr 04179-104 assigned as my head orderly in A2 since 12-21-2022 he has performed his duties without incident maintaining a high standard of cleanliness and safety that has helped to prevent sickness/injury  from spreading throughout the unit. He has been responsible for ensuring that 14 orderlies underneath him are completing their assigned work, and is instrumental in ensuring inmates are properly trained during initial job orientation. He routinely coordinates with the safety department to ensure proper materials are available.  Saint Cyr takes his responsibilities  seriously and has done this maintaining his incident report free since being assigned to his position. He has never taken or requested a day off or away from his duties in addition to never missing a deadline for projects assigned even if they were last minute. Saint Cyr has completed assigned work outside of his duties without complaint and takes initiative to complete his work even if supervising staff is not present.

This position is one of considerable trust and responsibility, requiring strong leadership, sound judgment, and integrity in managing both personal and institutional operations. *Id*.; *United States v. Spagnola*, 2023 U.S. Dist. LEXIS 137545, *4 (N.D. Ill. June 22, 2023) (highlighting an individual's employment as an orderly as evidence of their "trustworthiness and accountability"). Notably, Mr. Saint Cyr has never missed a single day of work during his tenure and has consistently received average or above-average performance evaluations from his supervisors. **Exhibit 2**: BOP Records at 2. His ability to effectively supervise others and maintain order in this capacity reflects his reliability, work ethic, and dedication to self-improvement.

Mr. Saint Cyr has also devoted significant time to volunteer work within the institution. He serves as an inmate peer tutor with the BOP Education Department, providing academic assistance and encouragement to other inmates seeking to improve their literacy, earn their GEDs, and further their education. **Exhibit 2**: BOP Records at 2. Mr. Saint Cyr also volunteers with the BOP Psychology Services as a suicide watch companion, a position of great trust and responsibility that requires compassion, patience, and emotional strength. *Id*. at 3. Suicide watch companions are selected by BOP staff through a rigorous process and must meet specific requirements in order to participate. Disciplinary records, conduct, and individual character are reviewed before people are selected to be a Companion. It is important to note Suicide Watch Companions have no extra incentive to participate—other than a personal desire to help others. This speaks volumes of Mr. Saint Cyr's resilient character and his unwavering dedication to living a meaningful life and helping others in the process.

Moreover, Mr. Saint Cyr's volunteer work has not been limited to the inside of prison walls. Impressively, he has independently organized a donation drive supporting two community-based

nonprofits: Policing Alternatives and Diversion Initiative and Frontline Response. **Exhibit 3**: BOP

Staff Character Letters, K. Bailey, Reentry Affairs Coordinator at 2.



*Mr. Saint Cyr pictured above (far left) with (1) other men incarcerated at FCI Atlanta, (2) Morehouse Prison Student Ambassador, and (3) Denise White, Deputy Director of Fulton County's Policing Alternatives and Diversion Initiative.*

In all these roles, Mr. Saint Cyr has consistently demonstrated leadership, empathy, and a

genuine desire to help others.

Mr. Saint Cyr—after more than 12 years of incarceration—now stands before the Court as a fundamentally transformed man. He bears little resemblance to the 29-year-old who was arrested on these offenses. Through education, maturity, and hard-earned insight, he has come to understand the gravity of his past decisions, is truly remorseful, and is deeply committed to living a lawful, productive life. As one judge observed, when a person has made "extensive use of prison programming, the only thing left to provide the defendant with needed education or vocational training is to pursue an actual vocation." *United States v. Parker*, 461 F. Supp. 3d 966, 983 (C.D. Cal. 2020). That time has come for Mr. Saint Cyr.

Pursuant to 18 U.S.C. § 3582(c)(1)(A) and USSG § 1B1.13(b)(5), this Court should exercise its discretion and reduce Mr. Saint Cyr's sentence.

### V.      Consideration of the statutory sentencing factors at 18 U.S.C. § 3553(a) confirms the Court should use its authority to impose a reduced sentence.

A full assessment of the § 3553(a) factors weighs heavily in favor of a reduction in sentence and a finding that Mr. Saint Cyr poses no risk of danger to society. When considering the § 3553(a) factors and the broader purposes of sentencing, several facts weigh strongly in favor of release. Critically, the underlying offense involved no actual harm or victimization. The entire "stash house robbery" was a law enforcement controlled, reverse stash house sting with fictitious facts:

- No real drugs were ever present;
- No real individuals were ever endangered;
- No property was taken; and
- No physical harm occurred.

While Mr. Saint Cyr accepts responsibility for his conduct and for agreeing to participate in what he thought was a robbery, it is important to note that he was not the instigator, organizer, or originator of this offense. The Government's own evidence demonstrates that the UC conceived the idea, Cazy took the lead, and Mr. Saint Cyr's role was secondary and reactive. PSR ¶ 3-9.

To date, Mr. Saint Cyr has served over 12 years of incarceration. This time is sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and serve as a deterrent. The release of all his co-conspirators, especially the most culpable, reflects this. Forcing Mr. Saint Cyr to serve out his sentence when all his co-conspirators have been released would further an "unwarranted sentencing disparity," which courts are required to avoid by 18 U.S.C. § 3553(a)(6).

Mr. Saint Cyr does not pose a danger to the community. The conduct underlying the instant offense occurred more than 12 years ago, and his only other convictions consist of two minor traffic violations during his youth. Empirical data strongly supports the conclusion that Mr. Saint Cyr is unlikely to reoffend if released. The Sentencing Commission has found that "offenders with zero criminal history points have considerably lower recidivism rates than other offenders."[11] Among other findings, the Sentencing Commission concluded that "zero-point offenders" were less likely to be rearrested than "one point" offenders (26.8% compared to 42.3%), the largest variation of any comparison of offenders within the same criminal history category.[12] Mr. Saint Cyr has zero criminal history points and falls squarely within this lowest-risk group.

Length of incarceration further reduces the likelihood of recidivism. According to the Sentencing Commission, "offenders incarcerated for more than 120 months were identified as

---

[11] U.S. Sent. Comm'n, *Amendments to the Guidelines*, Apr. 27, 2023, available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf, p. 52 (citing U.S. Sent. Comm'n, *Recidivism of Federal Offenders Released in 2010 (2021)*, available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010) (last viewed January 23, 2026).

[12] *Id.*

having a statistically significant deterrent relationship between incarceration and recidivism."[13] In fact, in one research model, "offenders incarcerated for more than 120 months were estimated to be 45 percent less likely to recidivate."[14] In this case, Mr. Saint Cyr has now served more than 144 months (12 years) in federal custody. His lack of criminal history coupled with the length of his incarceration strongly supports the conclusion that he is highly unlikely to reoffend and would pose no danger to the community upon release.

Mr. Saint Cyr's lack of dangerous tendencies is also reflected by his commendable prison record, as indicated above. The Supreme Court has stated that a defendant's post-sentencing rehabilitation "may be highly relevant to several of the § 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing." *See Pepper v. United States*, 562 U.S. 476, 491 (2011) (explaining that a defendant's conduct post-sentencing "provides the most up-to-date picture of [a defendant's] 'history and characteristics'" (quoting 3553(a)(1))).

Still, Mr. Saint Cyr admits he has made some mistakes while incarcerated, as reflected in his disciplinary record. **Exhibit 2**: BOP Records at 17-18. However, in his 12 years of incarceration, Mr. Saint Cyr has not been involved with any controlled substance or any type of violence, equating to extremely powerful evidence of rehabilitation. *Id*. He has not received any disciplinary infractions in over five years. *Id*. In viewing the infractions listed on his disciplinary record, the Court must consider the stringent nature of the BOP's rules, under which even seemingly minor infractions are met with severe consequences, despite the lack of any direct threat

---

[13] U.S. Sent. Comm'n, *Length of Incarceration and Recidivism*, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200429_Recidivism-SentLength.pdf, p. 30 (last viewed January 23, 2026).

[14] *Id.*

to institutional security or the safety of others.[15] Given the circumstances and environment of prison facilities, receiving only minor infractions across a large span of time, with no incentive to behave, is laudable. Thus, Mr. Saint-Cyr's prison record as a whole, emphasizes the extraordinary steps he has taken towards self-reflection and rehabilitation, and paints a more accurate picture and far outweigh his missteps.

Considering his post-sentencing conduct in totality, the BOP has placed Mr. Saint Cyr in a "low risk of recidivism level." **Exhibit 2**: BOP Records at 7-9; *United States v. Coon*, No. 3:03-cr-151, 2021 WL 682064, at 6 (E.D. Tenn. Feb. 22, 2021) (defendant "adequately deterred" and posed minimum risk to community" where BOP considered defendant "to present a low risk of recidivism"). This assessment is done with the use of an evaluation tool that "has a high level of predictive accuracy."[16]

Mr. Saint Cyr's lack of threat to the public is further justified by his deportation status. *See United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006) ("[T]he need to protect the public from a defendant may be reduced in a case where, upon immediate release from incarceration, the Government will deport the defendant."). As stated in his progress report and sentence computation, Mr. Saint Cyr has a potential ICE detainer. **Exhibit 2**: BOP Records at 1 and 16. Also, as stated in the PSR, because Mr. Saint Cyr has been convicted of aggravated felony

---

[15] The lack of severity of these infractions are further showcased by their series numbers. The BOP assigns series numbers to all infractions. Those that fall within the 300's are least serious and 100's are the most serious. Mr. Saint Cyr has only obtained one disciplinary infract with a 100 series from over 6 years ago in 2019. **Exhibit 2**: BOP Records at 17-18. It is worth noting the "hazardous tool" found to be possessed by Mr. Saint Cyr, resulting in the 100 series infraction, was a cell phone—not a weapon or activity posing any indication of violence. *Id*. As a result of this violation, Mr. Saint Cyr lost 41 days of good-time credit and was sanctioned with one year of visitation restrictions, a penalty he has already fully completed. Viewed in context, his disciplinary record reflects sustained compliance with institutional rules and presents no public safety concerns.

[16] Nat'l Inst. of Justice, *2021 Review and Revalidation of the First Step Act Risk Assessment Tool 3* (Dec. 2021) (*available at*: https://nij.ojp.gov/topics/articles/predicting-recidivism-continuing-improve-bureau-prisons-risk-assessment-took)

drug trafficking offense, he is subject to mandatory ICE custody upon release, while his removal is determined and arranged. PSR ¶ 70, 71.  Mr. Saint Cyr's deportation is a punishment in and of itself, deterring any further criminal conduct. The United States Supreme Court has described deportation as "a particularly severe penalty" that is essentially a "life sentence of banishment." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1213 (2018); *Jordan v. DeGeorge*, 341 U.S. 223, 232 (1951).

Mr. Saint Cyr deeply values the unwavering support of his family, friends, and community, and has worked diligently to nurture these relationships despite his incarceration. His commitment to maintaining these connections is reflected in the numerous letters of support submitted on his behalf, each attesting to his character and the positive impact he has had on others. **Exhibit 5**: Letters of Support from Family and Community. In Haiti, Mr. Saint Cyr will be embraced and have support from family and community. His uncle, Pastor Irick Fangel Saint Cyr, assures Mr. Saint that he will be provided with necessary assistance toward his rehabilitation—employment, housing, etc. *Id*. at 1. After losing his grandmother, who raised him as her own, he wishes for nothing more than to have the opportunity of caring for his grandfather who is now in his nineties and in poor health. *Id*. at 2-3. Additionally, many others, including his children, are awaiting Mr. Saint Cyr's release and eager to surround him with love and support. *Id*. at 1-22.

Notably, Daniel Pierra, Justice of the Peace in Gonaïves, Haiti, and Marie-Elène Lesperance, Mayor of Pestel, Haiti, have submitted letters to the Court attesting to Mr. Saint Cyr's character and longstanding ties to his community. *Id.* at 4-9. Together, all of these letters paint a vivid picture of Mr. Saint Cyr's transformation and the robust support network that awaits him, ensuring a strong foundation for his re-entry into society.

## CONCLUSION

Over 12 years in prison is a very, very long time, particularly in light of the evolving judicial consensus rejecting the now-discredited law enforcement tactic of reverse stash house stings, which are rarely, if ever, employed today. Long before this opportunity to seek compassionate release arose, Mr. Saint Cyr committed himself to rehabilitation and personal growth. For more than a decade, he has borne the full weight of his sentence and its consequences.

Mr. Saint Cyr now seeks the chance to move beyond his past mistakes and demonstrate that he can be a productive, law-abiding member of society. He is the only defendant from this case who remains incarcerated. Continued imprisonment serves no meaningful purpose and advances neither public safety nor the interests of justice. For these reasons, Mr. Saint Cyr respectfully requests that the Court grant this motion and reduce his sentence on all counts to time served.

Respectfully submitted,

s/ *Fernando L. Tamayo*
Fernando L. Tamayo
Florida Bar No. 28530
Vedder Price (FL), LLP
600 Brickell Avenue, Suite 1500
Miami, Florida 33131
p. 786-741-3200
ftamayo@vedderprice.com

s/ *Brittany K. Barnett*
Brittany K. Barnett *(admitted pro hac vice)*
Texas Bar No. 24078196
Law Office of Brittany K. Barnett
2626 Cole Avenue, Suite 300
Dallas, Texas 75204
p. 214-473-4335
brittany@bkbarnettlaw.com

*Attorneys for Defendant Andre Saint Cyr*

## <u>CERTIFICATE OF SERVICE</u>

On January 29, 2026, I electronically filed this pleading with the Clerk of the Court using

the CM/ECF system which will send notice of electronic filing to all counsel of record.

s/ *Fernando L. Tamayo*
Fernando L. Tamayo
