# Exhibit 4

Evans Order

Case No. 93-00123-CR-Middlebrooks

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 93-00123-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA,

v.

SHERLON EVANS,

    Defendant.

_____/

## ORDER ON MOTION FOR SENTENCE REDUCTION

    Sherlon Evans has served over thirty-one years of a nearly fifty-year sentence, totaling 595 months.[1] Mr. Evans has now moved for a reduction in his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), claiming that "extraordinary and compelling" reasons warrant review. Following an initial uncounseled letter requesting relief, Mr. Evans filed the instant Motion on October 1, 2024. (DE 786; DE 802). The Government filed its Response on October 30, 2024, and renewed its arguments against the initial letter. (DE 810; DE 796).

    Mr. Evans cites two "extraordinary and compelling" bases recognized by the recent policy statement issued by the U.S. Sentencing Commission (the "Commission") as potentially justifying a reduction in sentence. First, Mr. Evans contends that he is serving an "unusually long sentence" that is subject to a substantive change in law, which would produce a "gross disparity" between the sentence he is currently serving and the sentence that would likely be imposed today. USSG § 1B1.13(b)(6); (DE 810 at 7-10). Second, Mr. Evans points to the "unique aspects of [his] case"

---

[1] Mr. Evans was originally sentenced to 684 months. (DE 790 at 1). On November 20, 2014, Mr. Evans filed a Motion to Reduce Sentence pursuant to 18 U.S.C. § 3582(c)(2), which the court granted on March 11, 2015. (DE 475; DE 510). Per the terms of that order, Mr. Evans's sentence was reduced from 684 months to 595 months. (DE 610 at 1).

under the "catch-all" provision of § 1B1.13(b)(5), which permits a reviewing court to consider "any other circumstance[s]" that are "similar in gravity" to the other extraordinary and compelling reasons recognized by the Commission. (DE 810 at 2-7).

      The Government opposes Mr. Evans's Motion in its entirety. It first challenges the validity of the Commission's new policy, claiming the Commission had no authority to issue it, that the policy conflicts with § 3582(c)(1)(A), and that the policy raises separation of powers concerns. The Government also argues that even if the new policy is binding, Mr. Evans is not entitled to a reduction under the supposedly compelling reasons he cites. I reject the Government's position on both fronts. Consistent with my prior holdings, I find Congress and the Commission "created an explicit pathway for individuals like [Mr. Evans] to request relief, and here such relief is warranted." *United States v. Hunt*, No. 06-80070-DMM, DE 1410 at 2 (October 7, 2024). On December 10, 2024, I held oral argument on the Motion. For the reasons below, I will grant Mr. Evans's request and reduce his sentence to time served.

## BACKGROUND

      A peculiar confluence of factors combined to cause Mr. Evans's harsh 684-month sentence. Mr. Evans was tried and convicted of conspiracy to possess with intent to distribute cocaine, the use of firearms during and in relation to a drug trafficking crime, possession of six unregistered firearms, and use of intimidation with intent to influence the testimony of another. These charges arose from a so-called "reverse stash house sting" perpetrated by agents of the Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Because both the crimes and their fallout are the result of atypical circumstances, a close examination of the factual record is in order.[2]

---

[2] Case-specific facts are taken from Mr. Evans's Presentence Investigation Report (or "PSI"), adopted by the court at sentencing; the transcript of his sentencing (DE 339); and the unpublished decision of the Eleventh Circuit denying his § 2255 petition (DE 398).

## A.  **The ATF's Reverse Sting Operations**

For the past thirty years,[3] the ATF has employed reverse stings to arrest and prosecute would-be drug dealers. The "standard playbook" of a reverse stash house sting is simple, and the facts between cases are "frequently nearly identical." *United States v. Kindle*, 698 F.3d 401, 404 (7th Cir. 2012), *vacated on other grounds sub nom.*, *United States v. Mayfield*, 771 F.3d 417 (7th Cir. 2014); *see also United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011) (describing stash house stings as producing "shopworn scenario[s]"). An undercover ATF officer or confidential informant will first reach out to select individuals, often with prior criminal histories, claiming to have knowledge of an incoming drug shipment. At the informant's urging, those ensnared agree to arrive at the shipment location, armed and prepared to steal the drugs. Upon the suspect's arrival, accompanied by those they had recruited, the trap is sprung—all are arrested on various charges of conspiracy to possess or distribute quantities of drugs that are wholly fictitious, and also often weapons possession charges, which further drive up sentencing exposure. The result is, potentially, the imposition of decades-long sentences of imprisonment.

From the early 2000s to the mid-2010s, the ATF "more than quadrupled the use of these controversial sting operations as part of a crime-fighting strategy meant to target armed and violent criminals." Marc D. Esterow, Note, *Lead Us Not Into Temptation: Stash House Stings and the Outrageous Government Conduct Defense*, 8 DREXEL L. REV. ONLINE 1, 5 (2016). More than "1,000 individuals have been prosecuted as a result of stash house stings," with the ATF leading operations in "major metropolitan cities all across the United States." *Id.* In recent years, the ATF's

---

[3] As the facts of this case reveal, the ATF has employed reverse stings since at least 1993, though this practice may have been used even before then.

3

employment of these stings has been subjected to growing scrutiny from the media, with features produced by the *New York Times*, the *Washington Post*, and the *New Yorker*.[4] In 2014, *USA Today* published an investigation finding that over 90% of those targeted in these ATF operations were racial or ethnic minorities, a rate "far higher than among people arrested for big-city violent crimes, or for other federal robbery, drug and gun offenses." Brad Heath, *Investigation: ATF Drug Stings Targeted Minorities*, USA TODAY (July 20, 2014), https://www.usatoday.com/story/news/nation/2014/07/20/atf-stash-house-stings-racial-profiling/12800195.

The ATF's tactics have also drawn criticism from the legal community. Although the ATF's sting operations have withstood challenges on the grounds of entrapment and outrageous government conduct,[5] reviewing courts, in upholding the stings, have expressed deep concerns about the extensive use of deception, and the methods by which targets are selected. In *United States v. Black*, the Ninth Circuit rejected a defendant's outrageous government conduct defense, yet opined that because "fiction" was at the core of the convictions, the defendants were primarily guilty for "responding to the government's script." 733 F.3d 294, 303 (9th Cir. 2013). The court also named a "second and major concern," that the ATF frequently found new suspects by "trolling for targets," with officers and informants "provocatively cast[ing] [their] bait in places defined only by economic and social conditions." *Id.* Other judges in the Seventh Circuit have referred to

---

[4] *See* Erik Eckholm, *More Judges Question Use of Fake Drugs in Sting Cases*, N.Y. TIMES (Nov. 20, 2014), http://www.nytimes.com/2014/11/21/us/lured-to-stings-by-fake-drugs-and-facing-jail-time-thats-all-too-real; Radley Balko, *Americans Deserve to Know if ATF Will Continue 'Stash House Stings,'* WASH. POST (June 9, 2022), https://www.washingtonpost.com/opinions/2022/06/09/atf-stash-house-stings-steven-dettelbach; Rachel Poser, *Stash-House Stings Carry Real Penalties for Fake Crimes*, NEW YORKER (Oct. 11, 2021), https://www.newyorker.com/magazine/2021/10/18/stash-house-stings-carry-real-penalties-for-fake-crimes.

[5] *See, e.g.*, *United States v. Tucker*, 28 F.3d 1420, 1421 (6th Cir. 1994); *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995); *United States v. Dunlap*, 593 Fed. App'x 619, 620 (9th Cir. 2014).

stash house stings as "disreputable," "tawdry," and "outrageous." *Kindle*, 698 F.3d at 414 (Posner, J., concurring in part and dissenting in part); *United States v. Conley*, 875 F.3d 391, 402 (7th Cir. 2017); *United States v. Conley*, No. 11-0779-6, 2021 WL 825669, at *4 (N.D. Ill. Mar. 4, 2021).

### B.  The Evans Sting

This case arose out of a reverse stash house sting. On February 24, 1993, an undercover ATF agent ("Agent"), posing as a drug dealer, offered an opportunity to several of Mr. Evans's co-defendants to rob a (fake) cocaine shipment, said to be arriving by vessel. The Agent had received a tip from a confidential informant that Leonard Henry, the apparent leader of the group, possessed several firearms he had been transporting from New York to Miami. Through the confidential informant, the Agent set up a meeting with Henry, during which time the Agent told Henry about the supposed incoming drugs and asked if Henry would be interested in "ripping off" the shipment, using the weapons the informant had identified. Henry agreed to the Agent's scheme, and assembled a team of seven men—including Mr. Evans—to conduct the "robbery."

Of significance, the precise quantity of drugs the Agent used to entice Henry was ever-shifting. When asked during the first meeting on February 24, the Agent initially reported to Henry that 400 kilograms of drugs would be shipped. The next day however, the Agent again met with Henry and two others—this time, including Mr. Evans—and stated that he could not guarantee the exact amount of drugs at the drop site. The Agent then asked Henry and the others what minimum quantity of contraband would be necessary for them to follow through with the crime. Mark Francis, the third man at the meeting, answered "300 kilos," but after further discussion, Henry stated they would go through with the robbery for 50 kilograms of cocaine.

On February 26, all eight co-defendants, including Henry and Evans, met with the Agent. Henry brought multiple weapons and silencers concealed in a hidden compartment of his vehicle,

including one weapon that was later determined to be a machine gun pistol. Several co-defendants proceeded to load themselves and a few of the weapons from Henry's car into a van provided by the Agent. Evans was among those who entered the van, though he was not directly observed handling the weapons. Then, before the van departed, ATF agents appeared and arrested the men. The ATF agents recovered weapons from the van, the hidden compartment of Henry's vehicle, and a third vehicle used by two other co-defendants. The "machine gun" was found in the van with Mr. Evans, whereas three silencers were found in the hidden compartment of Henry's vehicle.[6]

### C.  Trial, Sentencing, and Post-Conviction Process

In this case, there were no drugs, the contemplated robbery never took place, and no violence ultimately occurred. Nevertheless, all eight co-defendants were charged in the Second Superseding Indictment with conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846, knowingly using and carrying a firearm during and in relation to a drug trafficking crime, in violation of 18 U.S.C. § 924(c), and possession of unregistered firearms, in violation of 26 U.S.C. § 5861(d). Henry was separately charged with possession of a machine gun, in violation of 18 U.S.C. § 922(o)(1), and defendants Henry, Evans, and Cross were charged with intimidating a witness, in violation of 18 U.S.C. § 1512(b)(1).

Following an initial mistrial, the defendants were jointly tried in October 1994 before then-U.S. District Court Judge Daniel T.K. Hurley. The jury returned a verdict of guilty on all counts. The verdict further noted that as to Count II, all eight defendants were guilty of carrying silencers and a weapon they knew was a machine gun in furtherance of a drug offense. At sentencing, Judge Hurley found several crucial facts which enhanced Mr. Evans's ultimate sentence. Two findings

---

[6] A full breakdown of the type, quantity, and location of the weapons is laid out in the PSI. (PSI ¶¶ 18-20).

were especially important. First, the PSI calculated the base offense level of Count I using a drug quantity of 300 kilograms of cocaine, declaring that "[Henry's] group needed 300 kilograms of cocaine to make it worth their while." (PSI ¶ 33). Second, the PSI found that as to Count II, because a "machine gun" was involved, Mr. Evans was subject to a statutorily mandated thirty-year sentence. (*Id.* ¶ 44). The PSI was supported by the jury verdict, which included a determination that as to Count II, a machine gun and silencers were involved. (DE 240 at 1). Mr. Evans challenged both of the PSI's findings, claiming he was not present when the 300-kilogram figure was discussed, and that the relevant gun was not in fact a machine gun, despite the jury's determination. (DE 271).

At a sentencing hearing held on June 9, 1995, Judge Hurley addressed the contested drug quantity and characterization of the "machine gun." He first noted that "[t]he Court's responsibility is to resolve [sentencing allegations] looking to the standard of the greater weight of the evidence, the preponderance of the evidence," and that "once the evidence has been presented, the court must either, number one, make an explicit factual finding as to the allegation, or alternatively determine no such finding necessary." (DE 339 at 4). In accepting the PSI's finding that 300 kilograms was the relevant drug quantity, Judge Hurley admitted that he "share[d] many of the concerns . . . [that] for sentencing purposes under the Sentencing Reform Act of 1983 a driving factor is the amount of drugs involved, and so, when the drugs really don't exist at all . . . we are dealing with simply verbal assertions . . . [and] really, the sky [is] the limit." (*Id.* at 50).

Nevertheless, Judge Hurley determined that the controlling inquiry was "what was the mind set of the conspirators, what did they intend to do? Even though they hadn't achieved it . . . what the court has to look at is what was the agreement of the parties." (*Id.* at 53). Judge Hurley went on to apply this standard to Mr. Evans, stating that "[t]he parties knew that a shipment was

coming in . . . [t]he fact that the drugs just didn't exist, that they were a figment of law enforcement's creative imagination . . . [does not] undercut[] the mental state, or diminish[] the mental state of the defendants, of their criminal intent to steal 300 kilograms of cocaine." (*Id.*). Judge Hurley further found that even if Mr. Evans was not present when the 300-kilogram figure was discussed, "the very fact that he then joined in the conspiracy . . . would make him liable for what was the fully formed intent of the conspiracy under general conspiracy law." (*Id.* at 54). Mr. Evans was then sentenced in accordance with a drug quantity finding of 300 kilograms of cocaine.

Regarding the "machine gun," Judge Hurley again acknowledged the oddities of this case. He flagged that "the factual scenario underlying" the gun charge "[was] certainly an unusual one," as the weapon "was not designed to be a machine gun, appears not to have been modified . . . and yet either through wear and tear, or some other reason, it simply does, in fact, function as a machine gun." (*Id.* at 57). However, Judge Hurley observed that this would be a matter best resolved on appeal, as the jury had found under Count II that Mr. Evans used a machine gun in furtherance of the drug conspiracy, and had separately possessed the three gun silencers found in the hidden compartment of Henry's vehicle—each being an independent basis for applying the thirty-year sentencing enhancement. (*Id.* at 63-65).

Ultimately, Mr. Evans was sentenced to a total of 684 months. (DE 316). The sentence consisted of 324 months as to Count I and 120 months as to Counts IX and X, all to be served concurrently. Mr. Evans was also sentenced to thirty mandatorily consecutive years, or 360 months, as to Count II, reflecting a statutory enhancement invoked by the presence of the "machine gun." (*Id.* at 67-68). Judge Hurley explained the sentence pursuant to 18 U.S.C. § 3553(c), stating that "this case involves a conspiracy to possess drugs through the commission of an armed robbery and then the intent to distribute those drugs. This was a well-planned and thought-out conspiracy

as evidenced by a vehicle that had been outfitted to hide and transport an array of weapons." (*Id.* at 66). Judge Hurley's original sentence was reduced to 595 months following Mr. Evans's first successful motion under § 3592(c)(2), granted in March of 2015. (DE 475; DE 510).

## APPLICABLE LAW

### A. The First Step Act

Title 18, United States Code § 3582, titled "Imposition of a sentence of imprisonment," outlines the specific framework for modifications to a term of imprisonment. Section 3582(C)(1)(A) authorizes a court to consider a sentence reduction if it finds that one of two conditions are met: either "extraordinary and compelling reasons exist," or the Bureau of Prisons ("BOP") determines that certain defendants over 70 years of age, who have already served at least 30 years in prison, are not a danger to the community. *See* 18 U.S.C. § 3582(c)(1)(A)(i)-(ii). Importantly, satisfaction of either of these two criteria is not the end of the analysis; it only opens the door for the potential of a discretionary sentence reduction. The court must also consider the factors set forth in 18 U.S.C. § 3553(a) ("§ 3553 factors"). Any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c).

### B. Sentencing Commission Guidelines

In November 2023, the Commission amended its relevant policy statement describing the circumstances that can give rise to "extraordinary and compelling" reasons warranting a reduction inquiry. *See* U.S.S.G. § 1B1.13. As amended, the policy lists six circumstances of a defendant that may be considered, alone or in combination: (1) his medical situation, (2) his age, (3) his family circumstances, (4) whether he was the victim of abuse, and two additions of interest here:

> (5) Other Reasons. – The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

9

and:

> (6) Unusually Long Sentence. – If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

U.S.S.G. §§ 1B1.13(b)(5)-(6), Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index at 11 (U.S. Sent'g Comm'n 2023) (emphasis added) [hereinafter, "2023 Amendments"].

Mr. Evans cites both § 1B1.13(b)(5) and § 1B1.13(b)(6) as independently warranting reduction. If either provision does indeed open the door to the potential of a reduced sentence, I must fully consider Mr. Evans's own circumstances in view of the § 3553 factors, including the nature of the offense, the need for the sentence imposed to serve certain purposes (such as to reflect the seriousness of the offense), what sentences are available, applicable Commission policy, the need to correct sentencing discrepancies, and outstanding restitution needs. 18 U.S.C. § 3553(a).

### C. Sentencing Commission's Authority

The Government argues that the Commission's most recent policy statement is an unauthorized interpretation of the phrase "extraordinary and compelling." Namely, the Government claims the 2023 Amendments are unauthorized as contrary to the governing statute's text, structure, and purpose. The Government also adds that the Commission's interpretation of § 3582(c)(1)(A) wrongfully empowers district courts to apply non-retroactive changes in law to particular defendants, in violation of the doctrine of separation of powers. I do not agree.

As I have previously found, the Commission was acting upon a clear mandate from Congress in issuing the policy statement at issue, defining "extraordinary and compelling reasons." *Hunt*, No. 06-80070, D.E. 1410 at 8-11. The Commission is "authorized to promulgate general policy statements to further describe what may constitute 'extraordinary and compelling reasons'" as described in 18 U.S.C. § 3582(c)(1)(A)(i). *Id.* at 8. Under the plain text of the statute, a reviewing court attempting to modify an imposed term of imprisonment must ensure that any reduction, including a reduction for "extraordinary and compelling reasons," is "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Congress thereby instructed courts to look to the Commission's policies in finding "extraordinary and compelling reasons" to exist in a particular case. As such, the Commission acted within its congressionally mandated authority when it determined that an "unusually long sentence" may qualify as an extraordinary and compelling reason, and I am obliged to heed their findings.

Upholding the Commission's authority also accords with congressional intent. In creating the Commission through the Sentencing Reform Act of 1984 ("SRA"), Congress delineated the "Duties of the Commission" in 28 U.S.C. § 994. As to the Commission's interpretive role for § 3582(c)(1)(A), Congress wrote:

> The Commission, in promulgating general policy statements regarding the sentencing modification provision in section 3582(c)(1)(A) of title 18, *shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples*. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.

28 U.S.C. § 994(t) (emphasis added). Looking beyond the express language to the legislative history of the SRA, the August 3, 1983, Senate Report affirms that Congress intended to confer upon the Commission the authority to interpret the phrase "extraordinary and compelling":

11

> Subsection [t] requires the Commission to describe the "extraordinary and compelling reasons" that would justify a reduction of a particularly long sentence imposed pursuant to proposed 18 U.S.C. § 3582(C)(1)(A). The subsection specifically states, consistent with the rejection by the committee of the rehabilitation theory as the basis for determining the length of a term of imprisonment, that "rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for reducing the sentence.

S. Rep. No. 98-225, at 179 (1983). The Commission relied upon its express authority in drafting the 2023 policy amendments. Indeed, in promulgating the amendments, the Commission quotes the Senate Report's language within the "Reason for Amendment" section of its 2023 Amendments to the Sentencing Guidelines:

> Section 3582(c)(1)(A) authorizes a court to reduce a defendant's term of imprisonment if "extraordinary and compelling reasons" warrant a reduction and "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." Congress directed the Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." Sentencing Reform Act of 1984 ("SRA"), Pub. L. No. 98-473, 98 Stat. 1987, 2023 (codified at 28 U.S.C. § 994(t)). Congress also directed the Commission to promulgate general policy statements regarding the appropriate use of section 3582(c). 28 U.S.C. § 994(a)(2)(C).
>
> ….
>
> One of the expressed purposes of section 3582(c)(1)(A) when it was enacted in 1984 was to provide a narrow avenue for judicial relief from unusually long sentences. S. Rep. No. 98-225 (1983). Having abolished parole in the interest of certainty in sentencing, Congress recognized the need for such judicial authority. In effect, it replaced opaque Parole Commission review of every federal sentence with a transparent, judicial authority to consider reducing only a narrow subset of sentences – those presenting "extraordinary and compelling" reasons for a reduction.

U.S.S.G. § 1B1.13(b)(6), 2023 Amendments at 6, 11.

The Commission also cited 28 U.S.C. § 994(t)'s language in its "Amendments in Brief," which are "short summaries, usually one to two pages, of the Commission's actions in a certain area of sentencing policy and the issue that prompted the amendment to the federal sentencing guidelines." *Amendments in Brief*, United States Sentencing Commission, https://www.ussc.gov/topic/amendments-brief (last visited Oct. 1, 2024). It stated:

> The commission, in promulgating general policy statements regarding the sentencing modification provision in section 3582(c)(1)(A) of Title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction… – 28 U.S.C. § 994(t)[.]

*2023 Compassionate Release Amendment in Brief*, U.S. Sent'g Comm'n (Sept. 2023), https://www.ussc.gov/topic/amendments-brief. In the same section, the Commission refers to "the legislative history to the Sentencing Reform Act" as giving it the ability to enact such policy statements to define the phrase "extraordinary and compelling." *Id.*

I am obliged to "give effect to every word and provision in the statute when possible" and "may consult legislative history to elucidate a statute's ambiguous or vague terms," but may not use the legislative history "to contradict unambiguous statutory text or to read an ambiguity into a statute which is otherwise clear on its face." *Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1247 (11th Cir. 2008). Here, the plain text of the statutes and its legislative history establish the Commission's authority to promulgate policy statements that further define what constitutes an extraordinary and compelling reason under § 3582.

The Commission's interpretive authority has been confirmed by the Eleventh Circuit. In *United States v. Bryant*, the court upheld the Commission's power to promulgate a policy statement similar to that which the Government now challenges. 996 F.3d 1243 (11th Cir. 2021). There, the Commission's 2016 Policy Statement included a catch-all provision, Application Note

1(D) ("Other Reasons"), which permitted "the Director of the BOP" to determine whether a defendant presented extraordinary and compelling reasons other than those listed in the policy statement. U.S.S.G. § 1B1.13(b)(6), (U.S. Sent'g Comm'n 2016). In reviewing a challenge to this provision on the grounds that the § 1B1.13 policy statement was contrary to the First Step Act, the court held that the 2016 Policy Statement applied to all § 3582 motions, explaining that the Commission's guidelines "provide uniformity, predictability, and a degree of detachment lacking in our earlier system" that was fully intended by the SRA, which is why Congress "gave the Commission a 'substantial role' in sentence-modification proceedings by directing it to define the circumstances that justify a reduced sentence." *Bryant*, 996 F.3d at 1247-48, 1257.

The Government nevertheless maintains that the Commission's interpretation of "extraordinary and compelling," and in particular the inclusion of reductions for "unusually long" sentences, overstepped both the SRA's text and purpose. It claims that a change in law is neither extraordinary nor compelling, under the usual, common meaning of those terms, and therefore the Commission has unreasonably misinterpreted its delegating statute. (DE 796 at 11-16). But the Government oversimplifies what the Commission has done. The Commission did not say *any* change in law constitutes an extraordinary or compelling reason, but that a change in law *may* qualify "after full consideration of the defendant's individualized circumstances," and only if such change produces a "gross disparity" between a defendant's "unusually long sentence" and the sentence they would have received under current law. The Government's argument that a change in law inherently is neither extraordinary nor compelling thereby misses the mark.

The Government further argues that the Commission's revised policy undermines laws that Congress has not declared to be retroactive, as such laws may then be applied retroactively to "unusually long" sentences under § 3582(c)(1)(A). Yet, Congress's retroactivity decisions for

14

general statutes are wholly separate from its delegation of authority to the Commission under 18 U.S.C. § 3582(a). Congress could have limited the applicability of the First Step Act by specifying that it does not apply retroactively to those already sentenced. However, the very structure of the narrow exceptions of the Act, as contemplated by Congress, permits departure from the overarching principle of preserving the finality of criminal sentences in certain cases.[7]  The nonretroactivity of the First Step Act appears to me divorced from what the Commission can consider to be compelling on an individual case-by-case basis. And as I outlined above, Congress purposefully "gave the Commission a 'substantial role' in sentence-modification proceedings by directing it to define the circumstances that justify a reduced sentence." *Bryant*, 996 F.3d at 1257.

I note that prior to the Commission's 2023 Amendments, courts were split on the question of whether the text of the SRA, as amended by the First Step Act, permitted them to consider unusually long sentences as grounds for sentence reduction.[8] This split has endured because the Supreme Court has not yet decided the matter. *See e.g.*, *Thacker v. United States*, 142 S. Ct. 1363 (2022) (mem). As the Commission explained in its 2023 Amendments, in deciding whether to permit courts to consider a change in law as grounds for reduction, "the Commission was

---

[7] The legislative history of the Act is clear that § 3582(c)(1)(A) was enacted as a "safety valve" for "unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances." S. Rep. No. 98-225, at 38, 65 (1983).

[8] *Compare United States v. McCoy*, 981 F.3d 271, 285-87 (4th Cir. 2020) (holding that the severity of defendants' sentences, coupled with the disparity between what they would receive today, constituted extraordinary and compelling reasons for relief under the First Step Act), *and United States v. Rubalcaba*, 26 F.4th 14, 16 (1st Cir. 2022) (finding non-retroactive changes in sentencing law may be considered in light of a defendant's particular circumstances), *with United States v. Jarvis*, 999 F.3d 442, 443-44 (6th Cir. 2021) (declaring that a non-retroactive change in law could not count as an extraordinary and compelling reason for sentence reduction as a matter of law), *and United States v. Loggins*, 966 F.3d 891, 892-93 (8th Cir. 2020) (same). *But see United States v. McGee*, 992 F.3d 1035 (10th Cir. 2021) (holding that a sentencing disparity resulting from nonretroactive change in sentencing law may, in combination with other factors, constitute an extraordinary and compelling reason).

influenced by the fact that on several occasions the Department of Justice successfully opposed Supreme Court review of the issue *on the ground that it should be addressed first by the Commission*." U.S.S.G. § 1B1.13(b)(6), 2023 Amendments at 11; *see also* Memorandum for the United States in Opposition to Grant of Certiorari, *Thacker v. United States*, 142 S. Ct. 1363 (2022) (No. 21-877) (mem); Brief for the United States in Opposition to Grant of Certiorari, *Jarvis v. United States*, 142 S. Ct. 760 (2021) (No. 21-568) (mem). Pursuant to 28 U.S.C. § 994(p), the Commission has transmitted its amendments to the Sentencing Guidelines and forwarded its rationale to Congress, which have yet to be disturbed. *See* Amendments to the Sentencing Guidelines, Policy Statements, Official Commentary, and Statutory Index, 88 Fed. Reg. 28254 (May 3, 2023). I see no basis for unseating the Commission's findings at the Government's urging, as in promulgating the 2023 Amendments, the Commission has complied with its congressionally sanctioned duty, and brought clarity to this area of sentencing law.

## DISCUSSION

### A.  Mr. Evans's "Unusually Long Sentence" Under § 1B1.13(b)(6)

Mr. Evans cites two grounds for sentence reduction under the Commission's guidelines. First, he claims that a sentence reduction is proper under § 1B1.13(b)(6). As explained, this provision requires (1) an unusually long sentence, (2) an intervening nonretroactive change in law, and (3) a likelihood of gross disparity between the sentence imposed and the sentence that would likely be imposed today under the new law. U.S.S.G. § 1B1.13(b)(6). I agree Mr. Evans is serving an unusually long sentence, that a change in law has occurred, and that as to his drug charge, the intervening change in law would produce a grossly disparate sentence were he sentenced today. Moreover, further changes in law concerning aiding and abetting jury instructions warrant relief for his thirty-year gun sentence, as Mr. Evans likely would not be liable for the machine gun today.

### i. *Count I – Mr. Evans's Drug Charge*

First, it can hardly be doubted that Mr. Evans is serving an unusually long sentence. Mr. Evans has served thirty-one years of a forty-nine-year (595-month) sentence. In light of modern sentencing practices, a 595-month sentence is particularly long, as "only 11.9% of all federal crimes result in a sentence of greater than 120 months." *Hunt*, No. 06-80070, D.E. 1410 at 16 (citing statistics from the Commission). Moreover, the "average sentence length is 45 months, just under four years," and even "the average murder sentence is 265 months," nearly sixty months less than the amount of time Mr. Evans received for his drug charge alone. *Id.* The length of Mr. Evans's sentence is particularly striking in light of the fact that some of his co-defendants—including Walker, who took a more active role in the conspiracy—are set to be released from prison a year and a half before Mr. Evans. (DE 802 at 7).

The challenged sentence is also subject to a change in law, in the form of several intervening Supreme Court decisions. When Mr. Evans was sentenced, facts that were crucial in enhancing his ultimate sentence—including the quantity of drugs used to calculate the severity of his possession charge and the determination that a machine gun was involved—were facts to be found by the judge under the standard of preponderance of the evidence. However, five years later, the Supreme Court decided *Apprendi v. New Jersey*, holding that any facts which influence a defendant's maximum possible sentence must be found by a jury beyond a reasonable doubt. 530 U.S. 466, 467 (2000) (citing *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999) ("[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.")).

*Apprendi* and its progeny thereby established a firm constitutional principle, that facts altering the sentencing floor or ceiling must be found by a jury, not a judge. *See also Alleyne v. United States*, 570 U.S. 99, 103 (2013) (extending *Apprendi* to apply to facts altering the "floor" of the sentence, and declaring that "[a]ny fact that, by law, increases the penalty for the crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt"). To be sure, this constitutes a consequential change in law, as defendants today now benefit from constitutional protections that pre-*Apprendi* defendants like Mr. Evans did not enjoy.

The Government, for its part, contends that these Supreme Court decisions do not amount to a change in law. First, it insists that the *Apprendi* line of cases involved matters of statutory interpretation, in which a court does not announce "new" law, but merely states what the statute (in this case, various mandatory sentencing statutes) always meant. *See Fiore v. White*, 531 U.S. 225, 228 (2001) (per curiam); *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 313-14 & n.12 (1994). If true, this would make Mr. Evans's citation of *Apprendi* akin to a veiled claim of legal error—which has been read by some courts to be an inappropriate basis for relief under § 1B1.13(b)(6). *See United States v. Wesley*, 78 F.4th 1221, 1222 (10th Cir. 2023) (Tymkovich, J., concurring in denial of rehearing en banc). Second, the Government claims *Apprendi* amounts to a mere "procedural rule" that "does not alter 'the range of conduct or the class of persons that the law punishes,'" but only changes "the manner of determining the defendant's culpability." (DE 796 at 8) (quoting *Schriro v. Summerlin*, 542 U.S. 348, 353 (2004)).

I do not find the Government's arguments persuasive. The cases following *Apprendi* were not "judicial interpretation[s] of a statute," but rather interpretations of the Fifth, Sixth, and Fourteenth Amendments of the Constitution, with statutory implications. *See, e.g.*, *Jones*, 526 U.S. at 243 n.6 (citing the Fifth and Sixth Amendments); *Apprendi*, 530 U.S. at 469 ("The question

18

presented is whether the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt."); *Alleyne*, 570 U.S. at 115 (assessing the challenged statute under the Sixth Amendment). Moreover, Mr. Evans is not raising a challenge of legal error; he is not claiming, for instance, that Judge Hurley misapplied the statutes or acted erroneously in his factfinding. Rather, the intervening case law instructs that Judge Hurley should not have been the one to decide the facts *at all*—a clear change in law.

The notion that *Apprendi* amounted to a mere "procedural" change instead of a substantive one—and that somehow, § 1B1.13(b)(6) is sensitive to the distinction—is also meritless. *Apprendi* and its progeny did not only "allocate decisionmaking authority" between the judge and jury, but imposed an entirely different standard to the quantum of evidence required to find certain facts. Under the constitutional protections enshrined in *Apprendi*, a defendant is not subject to a sentence enhancement unless the facts are proven beyond a reasonable doubt, the highest evidentiary burden of proof in our criminal justice system. Further, even if *Apprendi* were procedural, it would remain applicable under § 1B1.13(b)(6). The plain text of the provision does not require that the "change in law" be "substantive" to qualify as extraordinary and compelling. Rather, it appears the Government would have me impose the substantive-procedural divide—often employed in cases of collateral attack—to the sentence reduction context. (DE 796 at 8-9 (citing cases)). I decline to do so, as neither the text nor purpose of § 1B1.13(b)(6) warrants reading in such a requirement.

The final question is whether the intervening change in law cited is likely to have produced a "gross disparity" in sentencing were Mr. Evans to be tried today. Here, the change in law impacts the key facts that lead to Mr. Evans's sentencing—that is, the drug quantity and the classification of one of the weapons as a machine gun. As to the former, under *Apprendi* a jury would need to

find the drug quantity for which Mr. Evans should be held accountable beyond a reasonable doubt; as explained by the Presentence Investigation Report, per § 2D1.1(a)(3) of the sentencing manual, the "base offense level is 38 when the offense involves 150 kilograms or more of cocaine." (PSI ¶ 33). Because Judge Hurley found by a preponderance of the evidence that Mr. Evans conspired to rob 300 kilograms of cocaine, the base offense level was 38, and given Mr. Evans's criminal history category of I, his resulting sentence was 324 months for the drug count.

Certainty of a different outcome is elusive in this matter, as no actual drugs were involved that may have persuaded a jury beyond a reasonable doubt that Mr. Evans should be held responsible for 300 kilograms of cocaine. Without any real drugs, Judge Hurley instead relied on the quantity of drugs Henry discussed with the ATF Agent prior to the sting. What *is* certain, then, is that an equally appropriate figure, 50 kilograms, could just have readily been found on the same evidence. Both figures were presented to the ATF Agent at the meeting when Mr. Evans was present. Indeed, 50 kilograms was the final quantity Henry reached, signaling his final intent. Accordingly, if a jury had decided the appropriate quantity of drugs beyond a reasonable doubt as mandated by *Apprendi*, Mr. Evans may well have been found liable for only 50 kilograms of cocaine, resulting in a base offense level of 34.[9] U.S.S.G. § 2D1.1(c). With no prior convictions, Mr. Evans's sentence would be 151-188 months, which—even if given the maximum—would be 136 months (roughly eleven years) less than what he received. As such, a gross disparity exists as to the sentence imposed for Count I under the change in law announced by *Apprendi*.

_____

[9] In the initial sentence, Mr. Evans's offense level was further increased by two points in the PSI due to the obstruction charges against him, which he does not now dispute. Accordingly, although a gross disparity exists between the offense levels imposed as a consequence of the varying drug quantities, for purposes of imposing a final pronouncement of his sentence, Mr. Evans as sentenced today would have an offense level of 36, which includes the appropriate drug quantity of 50 kilograms of cocaine and the undisputed obstruction charges. This offense level is subject to a sentencing range of 188 to 235 months.

ii.      *Count II – Mr. Evans's Firearms Charge*

Contrary to Count I, the intervening change of law in *Apprendi* does not alter the result of Count II. Mr. Evans was sentenced to a consecutive thirty-year sentence for Count II, enhanced by a provision under § 924(c) that applies when a machine gun or silencer is used during and in relation to a drug offense. Importantly, the crucial fact underlying the application of the § 924(c) sentencing enhancement, that a machine gun was involved, was not only found by Judge Hurley, but was *also* found by the jury beyond a reasonable doubt. On the jury verdict form, the jury found Mr. Evans guilty of Count II, and further determined that Mr. Evans knowingly carried both a machine gun and three gun silencers in furtherance of a drug crime—all the facts necessary to apply the § 924(c) enhancement. It is therefore of no consequence that Judge Hurley found and applied the facts for the sentence enhancement; Mr. Evans's sentence would be no different under current law, as the jury's determinations satisfy the demands of *Apprendi*.

But the law has changed in another way that potentially warrants a sentence reduction. The jury indeed found that Mr. Evans carried a "machine gun," that he knew it was a machine gun, and that he was responsible for the three silencers found in the hidden compartment of Henry's vehicle. However, as Judge Hurley remarked, the factual basis for these findings was sparse; he noted that the weapon "was not designed to be a machine gun," but "simply does, in fact, function as a machine gun." (DE 339 at 57). On appeal, the Eleventh Circuit noted it was likely the jury's finding was predicated on a theory of aiding and abetting, as the jury "found that Henry knew the firearm in question was a machine gun," thereby imputing knowledge of the machine gun (and the silencers) to Mr. Evans and the other co-defendants. *Evans v. United States*, 92 Fed. App'x 780 (11th Cir. 2004). Thus, Mr. Evans was likely held responsible for the machine gun and silencers not because he independently bought, carried, or used them, but by extension as an accomplice.

Although the government's theory of aiding and abetting may have justified the jury's findings—and the resulting thirty-year mandatory consecutive sentence imposed as a result under § 924(c)—in 1995, it would not survive scrutiny today. At trial, Judge Hurley explained to the jury that under the law of aiding and abetting, "the guilt of a defendant in a criminal case may be proved without evidence that a defendant personally did every act involved," and that "if the defendant aids and abets another person by willfully joining together . . . in the commission of a crime, then the law holds the defendant responsible for the conduct of the other person just as though the defendant had engaged in such conduct himself." (DE 335 at 146-47). However, in 2014, the Supreme Court found that this explanation of aiding and abetting was incomplete. In *Rosemond v. United States*, the Court explained that to be held liable for a co-defendant's firearm under § 924(c), an aider or abettor must have "advance knowledge" of the weapon, such that they may make "the relevant legal (and indeed, moral) choice" to continue aiding the crime. 572 U.S. 65, 79 (2014). The Court further explained that "when an accomplice knows nothing of a gun until it appears at the scene, he may already have completed his acts of assistance; or even if not, he may at that late point have no realistic opportunity to quit the crime." *Id.* The Court concluded that jury instructions on aiding and abetting must explain that to be liable, a defendant needs "advance knowledge of a firearm's presence," and require the jury to determine when such knowledge was acquired. *Id.* at 81-82. This decision "announced a new rule because it produced a result that was not dictated by preexisting precedent," thereby qualifying as a change in law. *Steiner v. United States*, 940 F.3d 1282, 1290 (11th Cir. 2019) (explaining that before *Rosemond*, "the law of this Circuit, and others, did not require the government to prove that the defendant had advance

knowledge that a co-conspirator would be armed"); *see also id.* (concluding the rule in *Rosemond* is substantive).[10]

The intervening decision of *Rosemond* meaningfully alters the likely outcome of Mr. Evans's case. Not only did Judge Hurley's instruction not require the jury to determine *when* Mr. Evans acquired foreknowledge of the machine gun or silencers; it did not require the jury to find that Mr. Evans had *any* foreknowledge of the gun or silencers. Nor is it clear how the government could have proven such foreknowledge. As Judge Hurley later opined, it was not obviously clear to anyone that the gun could fire as a machine gun. *See United States v. Pérez-Greaux*, 83 F.4th 1, 12 (1st Cir. 2023) (holding that under § 924(c), "the government [is] required to prove, beyond a reasonable doubt, that [defendant] knew that the firearm he possessed had the characteristics of a machine gun"). Nor was there any evidence that Mr. Evans ever held or interacted with the gun; it was simply found in the same van where he was arrested. The silencers were even further removed; they were found in the secret compartment of a wholly different vehicle. Consequently, if the government was required to prove foreknowledge of the machine gun or silencers under § 924(c), rather than relying on vicarious liability through the knowledge of Henry and the other co-defendants, the likely outcome would be that Mr. Evans would not be serving the thirty-year

---

[10] I note that in *Steiner*, the Eleventh Circuit also held that *Rosemond* may apply retroactively on collateral attack. *See Steiner*, 940 F.3d at 1289. Under the plain language of § 1B1.13(b)(6), this is immaterial. Although the Commission intended for § 1B1.13(b)(6) to primarily capture non-retroactive changes in law, *see* U.S.S.G. § 1B1.13(b)(6), 2023 Amendments at 8, the language of § 1B1.13(b)(6) as codified simply says that a "change in law" is required. This is not to say, as the Government suggests, that § 1B1.13(b)(6) is at risk of subsuming other remedial vehicles that utilize retroactive changes in law, such as the collateral attack review supplied by 28 U.S.C. § 2255. (DE 796 at 7, 14-15). After all, § 1B1.13(b)(6) imposes several barriers to relief not present in § 2255, including the need to demonstrate a "gross disparity" in a pre-existing "unusually long sentence," rendering the provisions distinct. Whereas § 2255 lacks the limiting language of "gross disparity," it applies only to retroactive changes in law; by contrast, § 1B1.13(b)(6) is broader in scope, as it potentially embraces retroactive and non-retroactive changes, but requires movants to clear additional statutory hurdles to be afforded relief.

enhanced sentence he was given, but rather the usual five-year sentence for carrying *any* weapon in furtherance of a drug trafficking crime (presuming the government could prove foreknowledge of any of the other weapons found in the van, which were not machine guns). 18 U.S.C. § 924(c)(1)(A)(i). Combined with the amended sentence for Count I, Mr. Evans likely would have received a total of 248 months at most under current law (approximately 20 years), as opposed to the 684 months he received in 1995. As such, the changes in law announced by *Apprendi* and *Rosemond* produce a gross disparity in Mr. Evans's sentence as to Counts I and II respectively, constituting an extraordinary and compelling reason for reduction under § 1B1.13(b)(6).

## B.  The Presence of "Other Circumstances" Under U.S.S.G. § 1B1.13(b)(5)

In addition to the intervening changes in law Mr. Evans cites pursuant to § 1B1.13(b)(6), the relatively more flexible standard of § 1B1.13(b)(5) supplies an additional basis for reducing Mr. Evans's sentence. The provision affords a reviewing court discretion to consider a sentence reduction where "any other circumstance or combination of circumstances" that are of "similar gravity" to those recognized by the Commission are present. On review of the particulars of this case, I find that circumstances of sufficient gravity are present.

When codifying the catch-all provision of § 1B1.13(b)(5), the Commission anticipated that their guidelines would be broadly applied. Before the Commission were statements from a plethora of legal experts, including Erica Zunkel, a professor of law at the University of Chicago, who argued that "[t]he Commission must codify judicial discretion to identify extraordinary and [compelling] circumstances beyond those enumerated in the policy statement if compassionate release is to function as Congress intended . . . . the enumerated categories will inevitably be underinclusive of all cases." Erica Zunkel, Clinical Professor of Law, University of Chicago, Statement Before the United States Sentencing Commission at 17 (Feb. 23, 2023). Indeed, Zunkel

expressly cited reverse stash house stings, which she contended "illustrate the need for a catch-all category that codifies broad judicial discretion." *Id.* at 18. Prior to the adoption of the modified policy, the Chair of the Commission remarked that "the Commission's inability to describe extraordinary and compelling reasons [has] led to injustices," and that thereby the Commission aimed to "grant[] broad discretion to those using the reduction provision," as "to do justice, judges must be able to modify sentences whenever new 'extraordinary and compelling' reasons arise." Carlton Reeves, Chair, U.S. Sent'g Comm'n, Remarks as Prepared for Delivery by Chair Carlton E. Reeves (Apr. 5, 2023). Thus, in drafting § 1B1.13(b)(5), the Commission's express aim was to purposefully empower judges to exercise broad discretion, and decide on a case-by-case basis whether the catch-all provision should be applied to a particular sentence.

Other reviewing courts, in applying § 1B1.13(b)(5), have agreed that the provision embraces a broad range of potential circumstances. Citing § 1B1.13(b)(5), courts have reduced sentences because such sentences were "excessive and disproportionate," *United States v. Smith*, No. 12-479, 2024 WL 733221, at **2-3 (D. Md. Feb. 21, 2024), were "draconian and oppressive [in] length" and being served by a defendant with a clear record of rehabilitation, *United States v. Brown*, 715 F. Supp. 3d 1034, 1044-56 (S.D. Ohio 2024), were the "product of the Government's pressure campaign" to commit the crime, *United States v. Cromitie*, No. 09-558-1, 2024 WL 216540, at **5-6 (S.D.N.Y. Jan. 19, 2024), or were being served by an elderly defendant who was very young when sentenced, *United States v. King*, No. 06-00658, 2023 WL 7194866, at *5 (N.D. Cal. Nov. 1, 2023). Although the limits of the Commission's new policy are still being tested in the courts, the trend across the country is clear: judges have found in § 1B1.13(b)(5) a mechanism to do justice where unenumerated extraordinary and compelling reasons so warrant.

Here, the circumstances surrounding Mr. Evans's conviction are of sufficient gravity under § 1B1.13(b)(5), as taken together, they compel the conclusion that his continued incarceration would be manifestly unjust. Two circumstances are of particular import: that Mr. Evans was prosecuted for taking part in a conspiracy manufactured by the ATF, and that his role in said conspiracy was relatively minor. These factors, while not statutorily relevant when Mr. Evans was initially sentenced, may nevertheless warrant a sentence reduction under § 1B1.13(b)(5), thereby opening the door to consideration of the § 3553 factors.

First is perhaps the most glaring circumstance, which is the role the ATF played in the formation of the conspiracy. At the risk of belaboring the point, Mr. Evans's arrest and incarceration resulted from a reverse stash house sting, a tactic that has been decried by numerous courts across the country. Particularly robust denouncements of reverse stings have come from the Seventh Circuit, where Judge Posner wrote that "such stings are a disreputable tactic" involving "the extensive use of inducements and unrealistic temptations," which "[l]aw enforcement uses . . . to increase the amount of drugs that can be attributed to the persons stung, so as to jack up their sentences."[11] *Kindle*, 698 F.3d at 414 (quoting Eda Katharine Tinto, "Undercover Policing,

---

[11] Judge Posner also questioned whether such stings were actually helpful in the broader war on drugs. As he explained, such stings are not "likely to reduce the sale and use of illegal drugs," but are "likely to have the opposite effect," since

> [s]tash house robbers do not increase the amount of drugs in circulation, since they steal their drugs instead of making or importing them. The effect of a fictitious stash house sting . . . is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber (unless the defendant was entrapped) and deters other criminals from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses— security obtained at no cost to the operators of stash houses—reduces their cost of self-protection, which is a principal cost of the illegal-drug business. The lower a business's costs, the lower the prices charged

Overstated Culpability" 51–52 (NYU School of Law, Public Law Research Paper No. 12–04, August 2012; forthcoming in Cardozo Law Review, vol. 34, 2013), http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2016362). Judge Posner's colleague, Judge Evans, similarly opined that reverse stings are "directed at unsophisticated, and perhaps desperate defendants who easily snap at the bait put out for them by [the ATF]," *United States v. Lewis*, 641 F.3d 773, 777 (7th Cir. 2011), and Judge Coleman of the Northern District of Illinois declared that the stings "are, in most cases, an unproductive set up targeting poor people of color." *United States v. Conley*, No. 11-779-6, 2015 WL 394012, at *6 (N.D. Ill. Jan. 29, 2015); *see also Conley*, 2021 WL 825669, at *4.

Such concerns are not cabined to the Seventh Circuit, but have been shared by courts across the country. As previously discussed, many judges in the Ninth Circuit have been similarly skeptical of the employment of reverse sting tactics. *See, e.g.*, *United States v. Briggs*, 623 F.3d 724, 729–30 (9th Cir. 2010) (expressing concern that fictitious stash house operations give the government a virtually unfettered ability to inflate the amount of drugs and minimize obstacles to prosecution); *Black*, 750 F.3d at 1057–58 (9th Cir. 2014) (Reinhardt, J., dissenting from denial of rehearing en banc) ("[I]n this era of mass incarceration . . . it is especially curious that the government feels compelled to invent fake crimes and imprison people for long periods of time for agreeing to participate in them—people who but for the government's scheme might not have ever entered the world of major felonies."). Further commentary from the Sixth and Third Circuits have added to the growing consensus that such tactics are unethical. *See, e.g.*, *United States v. Flowers*, 712 Fed. App'x 492, 511 (6th Cir. 2017) (Stranch, J., concurring) ("I find the concept of

---

consumers, and so the greater the demand for illegal drugs and the more sales and consumption of them. The operators of stash houses would pay law enforcement to sting potential stash house robbers.

*Kindle*, 698 F.3d at 416 (Posner, J., concurring in part and dissenting in part).

these 'stash house sting' operations at odds with the pride we take in presenting American criminal justice as a system that treats defendants fairly and equally under the law."); *United States v. Washington*, 869 F.3d 193, 213 (3d Cir. 2017) (recounting misgivings about the wisdom and viability of reverse stash house stings.); *id.* at 223 (McKee, J., dissenting) ("[T]he potential for abuse and mischief that is endemic to fictitious stash house stings should not be ignored.").

Perhaps the most damning indictment of the stash house stings, however, is the fact that such stings have become vanishingly rare. As several courts have noted, the ATF appears to have quietly discontinued its usage of reverse stash house stings, serving as an independent basis for reducing the sentences of those already convicted. *See, e.g.*, *United States v. Spagnola*, No. 07-441-2, 2023 WL 5004396, at *3 (N.D. Ill. June 22, 2023) ("[C]ontinued incarceration for crimes the government no longer prosecutes or investigates constitutes an extraordinary and compelling reason to grant compassionate release under the statute."); *United States v. Logan*, No. 07-270-2, 2023 WL 2771165, at *4 (N.D. Ill. Apr. 4, 2023) ("[Defendant's] continued incarceration for crimes that the government later deliberately ceased to prosecute . . . constitutes on its own an extraordinary and compelling reason under section 3582(c)(1)(A)."). Moreover, at least forty-three defendants who were convicted through reverse stash house stings have since had their sentences reduced to an average of just *three years* following protracted litigation against the ATF for alleged racial discrimination in its implementation of reverse stings.[12]

---

[12] *See* Christopher Blitch's Motion for Compassionate Release Under 18 U.S.C. § 3582(c)(1)(A)(i) at Ex. M, *United States v. Blitch*, No. 06-CR-586-2 (N.D. Ill. May 10, 2021), Dkt. 635. In December 2017, attorneys with the University of the Chicago Law School's Federal Criminal Justice Clinic ("FCJC") represented some forty-three stash house defendants from across the country at a joint evidentiary hearing in Chicago, before nine federal district judges. *See United States v. Paxton*, No. 13-CR-0103, 2018 WL 4504160, at *1 (N.D. Ill. Sept. 20, 2018). The question before the panel was whether the ATF's targeting system for its sting operations was a product of racial discrimination. *See* Motion to Dismiss for Racially Selective Law Enforcement at 9–10, *United States v. Brown*, 299 F. Supp. 3d 976 (N.D. Ill. 2018) (No. 12-CR-0632-RC), ECF

Second, the circumstances of Mr. Evans's sentence are even more striking in light of the fact that he played a relatively minor role in the conspiracy orchestrated by the ATF and Henry. That is, Mr. Evans was arrested because he was present when Henry planned and executed the "robbery." I use the term "present," as "the case against Mr. Evans was one that rose and fell on presence, and nothing more than presence. Presence [at] one meeting in which he may or may not have had very little to say, and presence along with everybody else at the scene of the offense at the time the arrests were made." (DE 339 at 58). Mr. Evans was not the ringleader or mastermind, did not supply weapons or recruit the other co-defendants into the scheme. He was not even present when the conspiracy was hatched. He was a tagalong, a hired hand to assist in the criminal deeds of others. Yet, Mr. Evans was sentenced with nearly the same degree of severity as those who were arguably more culpable in the commission of the crime. *See Brown*, 715 F. Supp. 3d at 1045 (applying § 1B1.13(b)(5) to a long sentence, which was found overly long "when compared to the time that [defendant's] co-defendants served in prison").

Other reviewing courts, in applying § 1B1.13(b)(5), have found similar circumstances to be compelling. With facts remarkably like this case, in *United States v. Conley*, the defendant was caught in a reverse stash house sting and sentenced to 180 months in prison. *Conley*, 2021 WL 825669, at *4. The defendant "was not actively involved in the planning" of the crime, "and in fact

---

No. 518. At that hearing, the FCJC's expert interpreted ATF sting data from across the country, and concluded that no race-neutral explanation could account for the disparate results of the ATF's operations, which overwhelmingly resulted in the prosecution of people of color. Report of Jeffrey Fagan, Ph.D. at 15, *United States v. Brown*, 299 F. Supp. 3d 976 (N.D. Ill. 2018) (No. 12-CR-0632-RC), https://www.law.uchicago.edu/files/files/report_of_jeffrey_fagan.pdf. Before the judges could issue a ruling however, prosecutors offered plea deals to all forty-three men charged, with nearly all being released from time served later in 2018. *See* Alison Siegler & William Admussen, *Discovering Racial Discrimination by the Police*, 115 Nw. U. L. Rev. 987, 1025 (2021). The Chicago U.S. Attorney's Office thereafter ceased charging fake stash house cases in Chicago. *See* Alison Siegler, *Racially Selective Law Enforcement Litigation in Federal Stash House Cases*, 26 The Circuit Rider 45, 47 (2019).

did not meet many of his co-defendants until the 'crime' had been arranged," yet he received more time in prison than any of his co-defendants. *Id.* As the court explained, "the Court's hands were tied by the fake drug amount, namely, fifty kilograms of cocaine, that the government arbitrarily decided was in the fake stash house, along with a fictious guard, who happened to be armed. In short, Conley's sentence was driven by the government's decisions in fabricating a false stash house and not the Court's consideration of what punishment was appropriate under the circumstances." *Id.* There, the court found a reduction in sentence proper under § 1B1.13(b)(5), as "Conley was the next to least culpable, yet received the longest prison sentence by double based on outrageous and disreputable law enforcement tactics, followed by the prosecution's relentless pursuit of the sentence despite the rebuke of these cases across the country." *Id.*; *cf. United States v. White*, No. 09-CR-687-4, 2021 WL 3418854 (N.D. Ill. Aug. 5, 2021) (holding that even before § 1B1.13(b)(5), stash house stings could produce extraordinary circumstances).

These cases echo my own dismay and discomfort with the concept of a reverse stash house sting. And when such a process results in a sentence of nearly half a century, that is an intolerable outcome. To be sure, § 1B1.13(b)(5) may not be a vehicle to question the wisdom of the Government's policing and prosecutorial practices. It *is* a vehicle, however, to question the wisdom of continuing to incarcerate this *particular* man for another decade or more. Sherlon Evans has served thirty-one years in federal prison for his presence in a conspiracy that he did not plan or lead, attempting to rob drugs that never existed, and carrying a "machine gun" that wasn't a machine gun, which he never bought, held, brandished, or used. If his original sentence is left unaltered, Mr. Evans will be well into his seventies when he leaves prison—without having been convicted of actually selling one gram of cocaine or hurting any other person. What circumstances, precisely, would be considered of commensurate gravity to those identified by the Commission if

not these? Accordingly, I find that the circumstances of this case are of sufficiently similar gravity to those recognized by the Commission, and in furtherance of the stated purpose of the 2023 Amendments, I agree that Mr. Evans's sentence merits reconsideration under the § 3553(a) factors.

### C. <u>Application of § 3553 Factors to Mr. Evans</u>

While the presence of "extraordinary or compelling reasons" may open the door to sentence reduction, it remains for me to determine whether Mr. Evans's particular circumstances, viewed through the lens of the factors listed in § 3553(a), merit a sentence reduction. The factors include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need for the sentence to reflect the seriousness of the offense, deter criminal conduct, protect the public, and provide defendant with educational or vocational training; (4) the types of sentences available; (5) sentencing recommendations and policy statements from the Commission; (6) the need to avoid sentencing disparities; and (7) the need to provide restitution to the victims.

Here, the § 3553 factors counsel reduction. Turning first to the nature of the offense, narcotics trafficking and weapons possession are serious crimes, and nothing in this Order should be interpreted as suggesting otherwise. But I reiterate that Mr. Evans is serving a nearly fifty-year prison term for his relatively minor role in a manufactured conspiracy, which resulted in no personal harm to anyone, nor any quantity of drugs hitting the streets. Moreover, as to Mr. Evans's personal history and characteristics, Mr. Evans's prison record reveals him to be a man who has worked to better himself, and made great strides in his rehabilitation. Although he had a seventh-grade education at the time of his arrest, Mr. Evans has now obtained his GED and furthered his education with skills training. Mr. Evans has not faced disciplinary action in twenty-four years, constituting a laudable record of good behavior. The consistent voices of support from his family and counselors reinforce the conclusion that Mr. Evans is no longer the man he was in 1993.

Continuing to the sentence's seriousness in light of the offense, it can hardly be argued that Mr. Evans has not faced appropriate consequences for his actions. Even if released immediately, Mr. Evans will still have served over *three decades* in prison for his crimes, a sentence rivaling those imposed for many serious violent offenses. His early release would in no way send a message that the judiciary has gone soft on drug traffickers, as the majority of Mr. Evans's adult life would still have been spent behind bars. Moreover, I note that the likelihood Mr. Evans would constitute any threat to the community upon his release is exceedingly minimal, as Mr. Evans will be sixty-one years old when released. Moreover, Mr. Evans is a citizen of Jamaica with an active immigration detainer, rendering him subject to removal proceedings upon his release.

The last two factors which are applicable here include factors six and seven: the need to avoid sentencing disparities and the need to provide restitution to the victims. As to the question of disparity, the United States is currently caught in an awkward transitional phase for those convicted of reverse stash house stings. As discussed above, a great many defendants have already been released or had their sentences considerably reduced, whereas other defendants—such as Mr. Evans—still face over a decade in prison for remarkably similar offenses. This imbalance will not do, as it serves to underscore the troubling outcomes inherent in the ATF's reverse stings. Because the government is able to artificially inflate sentences imposed by setting the quantity of "drugs" the defendants are after in a reverse sting, courts' hands are tied at the initial sentencing, and are only now attempting to correct for these stifling sentences in piecemeal fashion. I therefore find it appropriate to correct for the disparity in sentencing and reduce Mr. Evans's sentence, in line with the actions of other courts. Finally, restitution for victims weighs in favor of release, as Mr. Evans's crime had no victims, again emphasizing the egregiousness of his original sentence.

## CONCLUSION

"Criminals do sometimes change and get their lives back on track and we don't want the government pushing them . . . into a life of crime." *Kindle*, 698 F.3d at 415-16 (Posner, J., concurring in part and dissenting in part) (citing *Sherman v. United States*, 356 U.S. 369, 375–76 (1958)). When the Government targets a would-be offender and "beguiles him into committing crimes which he otherwise [may] not have attempted," courts should be skeptical of the sentence imposed. *Sherman*, 356 U.S. at 376. That skepticism should reach its apex when the resulting sentence is nearly fifty years. Under § 3582(c)(1)(A) and upon the instructions of the Commission, it is the duty of a reviewing court to consider granting a sentence reduction where "extraordinary and compelling reasons" so require. Here, not only has there been an intervening change of law that would have resulted in a much lower sentence for Mr. Evans, but the circumstances surrounding his arrest and incarceration are of such gravity that a reduction is warranted.

Accordingly, it is **ORDERED AND ADJUDGED** that:

1. Sherlon Evans's Motion to Reduce Sentence (DE 802) is **GRANTED.**

2. It is the judgment of the Court that the Defendant, **SHERLON EVANS**, is committed to the Bureau of Prisons to be imprisoned for **TIME SERVED**. This term consists of 188 months as to Count I, and 120 months as to each of Counts IX and X, to be served concurrently, and a term of 60 months as to Count II to be served consecutively to the term imposed as to each of Counts I, IX, and X.

3. An Amended Judgment will be entered separately.

**SIGNED** in Chambers at Miami, Florida, this 10th day of December, 2024.

Donald M. Middlebrooks
United States District Judge